UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
_____

|  |  |  |
|---|---|---|
| CRAIG ROBINS, | : | |
| | : | No. 10-CV-2787 (WHP) |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| DAVID ZWIRNER, | : | |
| DAVID ZWIRNER GALLERY, LLC, and | : | |
| DAVID ZWIRNER, INC., | : | |
| | : | |
| Defendants. | : | |

_____:


## DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

PATTERSON BELKNAP WEBB & TYLER LLP
Peter C. Harvey
Jo Backer Laird
Matthew B. Larsen
1133 Avenue of the Americas
New York, New York  10036
Tel. (212) 336-2000
Fax. (212) 336-2222

*Attorneys for Defendants*

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ....................................................................................................... ii

PRELIMINARY STATEMENT .................................................................................................1

STATEMENT OF FACTS ..........................................................................................................2

    A.    Prior Sale of Artwork.................................................................................................2

    B.    No Confidentiality Agreement....................................................................................3

    C.    Robins' 2005 Threatened Litigation and 2005 Purported Agreement....................3

    D.    Lack of Specific Contract Terms and General Vagueness .......................................5

    E.    Robins' Request to Purchase a Painting ..................................................................5

    F.    Commencement of this Action ...................................................................................6

ARGUMENT ...............................................................................................................................6

    I.    ROBINS WILL NOT BE IRREPARABLY HARMED IF ZWIRNER DOES
        NOT SELL HIM ONE OF HIS THREE "FIRST CHOICES"...............................7

    II.    ROBINS HAS NO LIKELIHOOD OF SUCCESS ON THE MERITS .................9

        A. The Alleged Agreements are Unenforceable Under the Statute of Frauds....... 9

        B. The Alleged Agreement Is Too Vague to be Enforceable ............................. 11

        C. Zwirner Did Not Breach the Purported Agreement ....................................... 13

        D. Robins' "Blacklist" Claims are Not Actionable ............................................ 14

        E. Robins' Fraudulent-Inducement Claims are Defective .................................. 15

    III.    THE BALANCE OF HARDSHIPS TIPS DECIDEDLY IN FAVOR OF
        ZWIRNER, NOT ROBINS .................................................................................16

CONCLUSION..........................................................................................................................17

# TABLE OF AUTHORITIES

## CASES

American-European Art Associates, Inc. v. Trend Galleries, Inc.,
  227 A.D.2d 170, 641 N.Y.S.2d 835 (1st Dep't 1996) ...................................................11

Brener & Lewis Management, Inc. v. Engel,
  168 A.D.2d 254, 562 N.Y.S.2d 488 (1st Dep't 1990) ...................................................12

Buffalo Forge Co. v. Ampco-Pittsburgh Corp.,
  638 F.2d 568 (2d Cir. 1981)...................................................................................... 6-7

Candid Productions, Inc. v. International Skating Union,
  530 F. Supp. 1330 (S.D.N.Y. 1982)...............................................................11, 12, 13

Blue Lotus Holdings Ltd. v. United States, 1996 WL 679758 (N.D.N.Y. 1996)............7, 8

Detroy v. American Guild of Variety Artists,
  286 F.2d 75 (2d Cir. 1961).........................................................................................14

Citigroup Global Markets, Inc. v. VCG Special Opportunities Master Fund Ltd.,
  ___ F.3d ___, 2010 WL 786584 (2d Cir. Mar. 10, 2010).........................................6, 17

Computech Intern., Inc. v. Compaq Computer Corp.,
  2002 WL 31398933 (S.D.N.Y. 2002).........................................................................10

Consolidated Gold Fields, PLC v. Anglo American Corp. of South Africa Ltd.,
  713 F. Supp. 1457 (S.D.N.Y. 1989)............................................................................17

Essa Realty Corp. v. J. Thomas Realty Corp.,
  70 A.D.3d 483, 894 N.Y.S.2d 417 (1st Dep't 2010) ...................................................13

Ginsburg v. Ock-A-Bock Community Ass'n, Inc.,
  34 A.D.3d 637, 825 N.Y.S.2d 119 (2d Dep't 2006) .....................................................8

Hessel v. Christie's Inc.,
  399 F. Supp. 2d 506 (S.D.N.Y. 2005)...............................................................7, 8, 16

Joseph Martin, Jr., Delicatessen, Inc. v. Schumacher,
  52 N.Y.2d 105 (N.Y. 1981) .......................................................................................12

Lucky Brand Dungarees, Inc. v. Ally Apparel Resources LLC,
  206 Fed. Appx. 10 (2d Cir. 2006)…………………………….………...................6

ii

Marbelite Co., Inc. v. National Sign and Signal Co., Inc.,
   2 Fed. Appx. 118 (2d Cir. 2001) ..............................................................10

Marcy Playground, Inc. v. Capitol Records, Inc.,
   6 F.Supp.2d 277 (S.D.N.Y. 1998) ...........................................................13

Mazurek v. Armstrong,
   520 U.S. 968 (1997)..................................................................................6

New York Univ. v. Continental Ins. Co.,
   87 N.Y.2d 308 (N.Y. 1995) ....................................................................15

Onecard Corp. v. Unisys Corp.,
   1991 WL 196399 (S.D.N.Y. 1991).........................................................8, 9

Orix Credit Alliance, Inc. v. R.E. Hable Co.,
   256 A.D.2d 114, 682 N.Y.S.2d 160 (1st Dep't 1998) ................................15

Phoenix Ancient Art, S.A. v. Kimbell Art Foundation,
   2003 WL 22705119 (S.D.N.Y. 2003).......................................................11

Sussman v. Crawford,
   488 F.3d 136 (2d Cir. 2007)....................................................................6, 9

**STATUTES**

N.Y. Gen. Oblig. Law § 5-701(a)(1) ...........................................................10, 13

N.Y. U.C.C. § 2-201(1)................................................................................10, 13

3877254v.1

## PRELIMINARY STATEMENT

Defendants David Zwirner, David Zwirner Gallery, LLC, and David Zwirner, Inc. (collectively, "Zwirner") hereby submit their memorandum of law in opposition to the motion of Plaintiff Craig Robins ("Robins") for a preliminary injunction prohibiting Zwirner from selling, for the duration of this action, any of three paintings by the highly regarded South African artist Marlene Dumas ("Dumas") now being shown at David Zwirner Gallery.

This is an action, as Robins puts it, to "augment[] his [Dumas] collection." (Pl.'s Br. at 6) By bringing suit, the wealthy Robins has literally made a federal case of not being able to buy what he wants, when he wants. This is an exercise of pure ego, and the case has no merit.

Robins cannot satisfy the test for the extraordinary relief of a preliminary injunction. First, he faces no irreparable harm. This Court has already ruled that denial of a plaintiff's wish to purchase a specific painting does not constitute irreparable harm.

Second, Robins cannot demonstrate a likelihood of success on the merits. Even if Zwirner had made the oral agreements that Robins alleges, they would be unenforceable pursuant to the Statute of Frauds: by their terms, they are of indefinite duration and therefore not capable of performance within one year; moreover, the supposed promise to sell Robins "one or more" Dumas works is a contract for the sale of goods worth considerably more than $500. For these reasons, the Statute of Frauds would require both alleged agreements to be in writing and signed by Zwirner. Robins has not even alleged that any written agreement signed by Zwirner exists, let alone proffered one as evidence. Additionally, Robins cannot seem to make up his mind about the precise terms of the supposed agreements. In a March 2010 e-mail, Robins claimed that he had a "commitment" from Zwirner to have "first choice on the Dumas show after museums." In his affidavit filed in support of the current request for injunctive relief, Robins

1

articulates a different agreement, namely, one that requires (i) first choice, after museums, of "one or more" works of art, (ii) access to the primary market for works by Dumas, (iii) and the removal of Robins' name from an alleged "blacklist" maintained by the artist.

As if Robins' confusion about the claimed oral agreements were not enough to deny him injunctive relief, his case has even more deficiencies. The supposed "one or more" agreement, in whatever version Robins ultimately sticks to, is too vague to be enforceable. Even as alleged by Robins, the agreement does not specify several material terms, including precise paintings to be sold by Zwirner, the number of paintings Robins would be entitled to purchase or the prices at which the paintings would be sold to him.

Even in the unlikely event that Robins could prove the existence of an enforceable contract to sell him "one or more" Dumas works, he cannot prove that Zwirner breached that agreement. Zwirner offered to sell Robins a Dumas painting from the current exhibition, but Robins refused to buy the work, boldly asserting: "I would more accurately classify [this] as a glaring sarcastic insult than a work of art."

Finally, the balance of hardships tips decidedly in favor of Zwirner, not Robins. Robins should not be able to place a cloud over multiple works of art in a show of international import merely to satisfy his whim to buy what he likes on demand. The encumbrance of Zwirner's art exhibition and the frustration of potential sales to clients are significant hardships that this Court should not permit.

## STATEMENT OF FACTS

### A.    Prior Sale of Artwork

Robins approached the Zwirner Gallery in October 2004 and asked, with the stated goal of making a substantial profit, to arrange the sale of a Dumas painting Robins owned, titled "Reinhardt's Daughter." (Zwirner Decl. ¶ 4) On November 8, 2004, Zwirner facilitated

the sale of the work to a Swiss gallery, which indicated that it would re-sell the work to a private Swiss client.  (Id. ¶ 5)  The Swiss gallery paid $925,000 for the work, and Robins made a significant profit.  (Id. ¶¶ 5, 7)  Robins claims that a "material part" of his arrangement with Zwirner "was that the sale would be kept absolutely confidential."  (Robins Aff. ¶ 3)

Robins does not allege that Zwirner disclosed the sale before it was complete. Rather, Robins asserts: "Sometime in early 2005," David Zwirner "informed [Dumas] that I had sold 'Reinhardt's Daughter' . . . in flagrant violation of our confidentiality agreement."  (Id. ¶ 6) Zwirner did tell Dumas of the sale, after it was complete, in accordance with Dumas' expectation of being informed of such sales and to inform her that the new owner would be willing to loan "Reinhardt's Daughter" for important exhibitions. (Zwirner Decl. ¶¶ 11, 13)  Robins claims that, upon being informed of the sale, "[Dumas] became so incensed that she literally blacklisted me from purchasing any other work of hers in the Primary Market."  (Robins Aff. ¶ 6)

**B.     No Confidentiality Agreement**

Zwirner never agreed to keep the sale of "Reinhardt's Daughter" confidential after the sale was complete.  (Zwirner Decl. ¶ 10).  Robins has produced no documentation reflecting any such promise of Zwirner's.  At Robins' request, David Zwirner signed a document titled "Robins Exchange No. 1004" (Zwirner Decl. ¶ 6, Ex. B), but that document contains no provision regarding confidentiality of the sale.  In fact, there is no contract, letter, invoice, e-mail or any other proof of Zwirner's alleged promise never to reveal Robins' sale of "Reinhardt's Daughter."

**C.     Robins' 2005 Threatened Litigation and 2005 Purported Agreement**

Although Zwirner never promised to keep the sale a secret after it was complete, David Zwirner met with Robins in May 2005 after Robins had made phone calls threatening litigation in light of his supposedly being "blacklisted."  (Zwirner Decl. ¶ 15)  In a conciliatory

3

effort to maintain their business relationship, David Zwirner proposed giving Robins an opportunity to buy works by high-demand artists Zwirner represented.  (Id.)  Robins did not accept that offer, and has not inquired of Zwirner about buying those artists' works.  (Id. ¶ 16)

Instead, Robins now asserts – five years later – that in exchange for his not suing Zwirner over the supposed breach of confidentiality concerning "Reinhardt's Daughter," David Zwirner verbally promised to sell Robins unspecified Dumas works of Robins' choosing having a value in the millions of dollars.

Robins, a law school graduate, did not memorialize in any manner this purported agreement in 2005.  In fact, no writing of any kind exists – other than those authored by Robins or his lawyer in anticipation of this lawsuit – that describes the agreement that Robins seeks to enforce in this action.

In a March 4, 2010 e-mail to David Zwirner, Robins claimed, "[W]e resolved our disagreement a few years ago with your commitment to give me first choice on the Dumas show after museums."  (Robins Aff., Ex. 1)  In his Affidavit submitted in support of his application for injunctive relief, Robins describes the alleged agreement differently.  He now says that Zwirner agreed that (i) "at such time that [he] and his gallery had an exhibition of works of art by [Dumas], [Robins] would have first choice, after museums, to purchase one or more such works of art by [Dumas] at that exhibition," (ii) Robins "would have access again to [Dumas'] Primary work" and (iii) Robins would "be taken off the blacklist."  (Robins Aff. ¶ 8.)  Robins claims that he and David Zwirner reached this agreement "face to face" and "shook hands on it."  (Id.)

Zwirner never made such an agreement (Zwirner Decl. ¶¶ 17-18), and Robins has again produced no documentation reflecting it.  Zwirner's receipt of Robins' March 4, 20010 e-mail was the first time that David Zwirner heard of the supposed promise.  (Id. ¶ 22)  Zwirner

responded to Robins in an e-mail stating: "I do not remember promising to give you priority in the purchase of a work by Dumas, and cannot find any record of any promise like that." (Robins Aff., Ex. 5)  Not only is there no record of Zwirner's supposed promise to give Robins first choice at a Dumas show, but Zwirner would not have made, could not have made, and did not make such a promise in March or April 2005 because Zwirner did not represent Dumas at that time.  (Zwirner Decl. ¶ 17)  Indeed, Zwirner did not begin to represent Dumas until three years later, in April 2008.  (Id.)

The current exhibition of 17 Dumas works, which is Zwirner's first Dumas show, opened on March 18, 2010 and runs until April 24, 2010.  (Id. ¶ 21)

### D.    Lack of Specific Contract Terms and General Vagueness

Besides there being no documentation of Zwirner's supposed promise to give Robins first choice at this show, the alleged promise is markedly vague.  According to Robins, Zwirner pledged in 2005 that Robins would have "first choice, after museums," to buy "one or more" of the works of Dumas, whom Zwirner did not then represent, in the event that Zwirner ever mounted a Dumas exhibition.  (Robins Aff. ¶ 8)  No duration is stated for this pledge.  No works are specified.  No prices or price ranges are supplied.  No limit on quantity is imposed. No indication is given as to whether Robins was to have *his* "first choice, after museums," of any and all works, or only *the* "first choice, after museums," of a work or works selected by Zwirner.

### E.    Robins' Request to Purchase a Painting

In response to Robins' emails in early March, Mr. Zwirner did offer to sell him a painting from the current Dumas show titled "The Grapes of Plenty."  (Id., Ex. 8)  Robins rejected that work.  In his affidavit in this action, he describes this work as his "close to last, if not last, and least expensive choice."  (Id. ¶ 13)  He also states, "I would more accurately classify

5

[this] as a glaring sarcastic insult than a work of art." (Id.) He adds in his brief that the painting is "the least desirable and aesthetically pleasing [Dumas] work." (Pl.'s Br. at 3)

Approximately one week after the current Dumas exhibition opened, Robins identified to Zwirner the three paintings comprising his "first choices" from the show: "Figure in a Landscape," "Under Construction" and "Wall Weeping." (Robins Aff. ¶ 11)

### F.     Commencement of this Action

Robins commenced this action on March 29, 2010, and initially sought a temporary restraining order regarding his "first choices." At a hearing on March 30, 2010, the Honorable John G. Koeltl "denied as moot" that application (Larsen Decl., Ex. A at 28:7-8) based on Zwirner's counsel's representation that none of Robins' "first choices" had been sold and none would be sold before the preliminary-injunction hearing without first notifying the Court. (Id. at 17:19-25)

### ARGUMENT

"'[A] preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a *clear showing,* carries the burden of persuasion.'" Sussman v. Crawford, 488 F.3d 136, 139 (2d Cir. 2007) (quoting Mazurek v. Armstrong, 520 U.S. 968, 972 (1997)) (emphasis in Mazurek).

"For the last five decades, this circuit has required a party seeking a preliminary injunction to show '(a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief.'" Citigroup Global Markets, Inc. v. VCG Special Opportunities Master Fund Ltd., ___ F.3d ___, 2010 WL 786584, at *3 (2d Cir. Mar. 10, 2010) (citations omitted). See also Lucky Brand Dungarees, Inc. v. Ally Apparel Resources LLC, 206 Fed. Appx. 10, 11 (2d Cir. 2006); Buffalo

6

Forge Co. v. Ampco-Pittsburgh Corp., 638 F.2d 568, 569 (2d Cir. 1981) (noting "this Court's continuing admonishments that interim injunctive relief is an 'extraordinary and drastic remedy which should not be routinely granted.'") (citation omitted). Robins' motion for a preliminary injunction should be denied because he fails to clearly make any of the showings required for issuance of such drastic relief.

### I.    ROBINS WILL NOT BE IRREPARABLY HARMED IF ZWIRNER DOES NOT SELL HIM ONE OF HIS THREE "FIRST CHOICES"

As Robins' counsel correctly observed at the March 30, 2010 hearing, "paintings are unique." (Larsen Decl., Ex. A at 5:7-8) That is not the point. If uniqueness were enough to show irreparable harm, then every plaintiff claiming entitlement to a unique good would automatically be halfway to getting a preliminary injunction. That is not the law.

In previously rejecting a claim to enjoin the sale of art, this Court held that thwarting a plaintiff's subjective desire to own a particular painting does not constitute irreparable harm. See Hessel v. Christie's Inc., 399 F. Supp. 2d 506 (S.D.N.Y. 2005). In Hessel, the plaintiff sought to preliminarily enjoin Christie's auction house from selling two paintings – one by Jeff Koons and one by Jean-Michel Basquiat – that he had won at auction but for which he had subsequently failed to make full payment. In finding that plaintiff Hessel had not shown irreparable harm, the Court explained:

> It is true, as Hessel notes, that "[t]he very nature of original fine art such as the Koons and Basquiat paintings make them unique in the world." It is also true, as Hessel notes, that if Christie's is not enjoined from selling the paintings, that he "will certainly lose the Koons and Basquiat paintings forever . . . ." However, Hessel has not sufficiently demonstrated that the Koons and Basquiat are his to lose. Although he insists that he is the "owner" of these paintings, as discussed *supra*, Hessel's claims to these paintings are doubtful at best. . . .
>
> Dashing Hessel's hope to own paintings that he does not actually own does not constitute irreparable harm. Cf. Blue Lotus Holdings Ltd. v. United States, No. 96 Cv. 233, 1996 WL 679758, at *2 (N.D.N.Y. Oct.22,

7

1996) ("The property is not Mr. Daunay's property and his subjective feelings about its uniqueness or beauty are not entitled to any weight.").

Id. at 519-520 (record citations omitted). See also Ginsburg v. Ock-A-Bock Community Ass'n, Inc., 34 A.D.3d 637, 637, 825 N.Y.S.2d 119, 120 (2d Dep't 2006) (affirming denial of preliminary injunction "regarding the rights of access to a beach" in light of plaintiffs' failure to show irreparable harm in denial of such access).

Given Hessel's failure to show irreparable harm, Robins certainly fails as well. By any account, Hessel had a much more compelling claim to the Koons and Basquiat than Robins has to his "first choices." Hessel made the highest bids for the Koons and Basquiat at auction, Christie's agreed to sell him those particular paintings at particular prices, and Hessel paid $1,198,750 of the combined purchase price of $2,367,000. See Hessel. 399 F. Supp. 2d at 510-512. In contrast, Zwirner never agreed to sell Robins the three paintings comprising his "first choices," and Robins has done no more than demand those works based on his belief that Dumas "may never do similar paintings." (Robins Aff. ¶ 17) Indeed, complains Robins, "I will not have the first provenance in any of the subject paintings[,] which is materially detrimental to my collection." (Id. ¶ 19) But as this Court noted in Hessel, "'subjective feelings about [property's] uniqueness or beauty are not entitled to any weight'" in assessing irreparable harm. 399 F. Supp. 2d at 520 (citation omitted). As in Hessel, "[d]ashing [Robins'] hope to own paintings that he does not actually own does not constitute irreparable harm."[1] Id. at 519.

---

1    Moreover, the Hessel court observed: "[T]he Koons has a fair market value of $2,000,000, [and] the Basquiat has a fair market value of $500,000 . . . . Thus, in the event that the Court ultimately found in Hessel's favor, there is a quantifiable dollar amount that he can recover." 399 F.Supp.2d at 519. The same goes for Robins' three "first choices," all of which already bear a fair market price in the still-running exhibition and all of which can again be valued for damages purposes in the unlikely event that Robins prevails on his claim of being entitled to "one or more" of the works.

Although Robins relies on <u>Onecard Corp. v. Unisys Corp.</u>, 1991 WL 196399 (S.D.N.Y. 1991), that case is easily distinguished from the facts at hand. There, Onecard claimed ownership of a Unisys-developed software system based on a "letter of intent executed by both parties." <u>Id</u>. at *1. Here, on the other hand, there is no letter of intent – or any other documentation – executed by the parties that gives Robins a claim to any of his "first choices." In extending a previously granted TRO, the <u>Onecard</u> court explained that Onecard had made a "proper showing" that such relief was warranted: "If Unisys transfers what Onecard claims it has *acquired* to a third party, Onecard would be irreparably injured." <u>Id</u>. at *1-*2 (emphasis added). In contrast, Robins has made no such "proper showing" of having *acquired* any of his "first choices." He merely asserts – without any documentation as was present in <u>Onecard</u> – that Zwirner promised him, five years ago, that he could buy "one or more" unspecified Dumas works at some unspecified future show. Because Robins has no right to buy any particular work at the current exhibition, he faces no irreparable harm in being denied the chance – as are many, many other potential buyers – to acquire his "first choices."

In sum, Robins has not made the "*clear showing*" of irreparable harm required to warrant the "extraordinary and drastic remedy" of a preliminary injunction. <u>Sussman</u>, 488 F.3d at 139 (citation omitted).

## II.     ROBINS HAS NO LIKELIHOOD OF SUCCESS ON THE MERITS

### A.     The Alleged Agreements are Unenforceable Under the Statute of Frauds

Robins claims that he has an oral contract for the purchase of art that costs over $1 million, and another oral agreement that Zwirner would never reveal the sale of "Reinhardt's Daughter." Robins has no writing of any kind signed by Zwirner that supports either claim. The Statute of Frauds is designed to preclude claims of this type.

9

"Under the Statute of Frauds, an agreement that by its terms cannot be performed within one year of its creation is void unless it is in writing.  Under New York law, contracts of indefinite duration are deemed to be incapable of being performed within a year, and thus fall within the ambit of the Statute of Frauds." Computech Intern., Inc. v. Compaq Computer Corp., 2002 WL 31398933, at *3 (S.D.N.Y. 2002) (citing N.Y. Gen. Oblig. Law § 5-701(a)(1); case citations omitted).  The alleged verbal agreement to keep the sale of "Reinhardt's Daughter" confidential is one of indefinite duration.  (Compl. ¶ 8; Robins Aff. ¶ 3)  There is no evidence of a written document in which Zwirner promised never to reveal that sale, let alone such a document signed by Zwirner, which the Statute also requires.  See N.Y. Gen. Oblig. Law § 5-701(a)(1).  Accordingly, Robins has no likelihood of prevailing on his claim that Zwirner breached this purported agreement because, even if the parties had made such an arrangement, it would be void for violating the Statute of Frauds.

The supposed verbal promise to give Robins "first choice" to buy "one or more" Dumas works at some future exhibition is void for the same reason: it is an agreement of indefinite duration (Compl. ¶ 12; Robins Aff. ¶ 8) and thus invalid pursuant to N.Y. Gen. Oblig. Law § 5-701(a)(1).  The alleged promise also violates the Statute's provision regarding sale of goods.  "Under New York law, 'a contract for the sale of goods for the price of $500 or more is not enforceable' unless there is a writing that is 'sufficient to indicate that a contract for sale has been made between the parties and signed by the party against whom enforcement is sought.'" Marbelite Co., Inc. v. National Sign and Signal Co., Inc., 2 Fed. Appx. 118, 120 (2d Cir. 2001) (quoting N.Y. U.C.C. § 2-201(1)).

At the March 30, 2010 hearing, Robins' counsel asserted that the alleged agreement is "not for the sale of goods necessarily.  It's a contract that once you have a show,

you will offer me first choice." (Larsen Decl., Ex. A at 21:6-8)  But this is belied by counsel's own characterization of the "*agreement to sell* plaintiff a first choice."  (Pl.'s Br. at 8) (emphasis added).  Moreover, any attempt to circumvent the Statute is disingenuous because, "[i]n determining whether or not a contract is one of sale or to provide services, we must look to the 'essence' of the agreement." Marbelite, 2 Fed. Appx. at 120 (citations omitted).  The reason to "offer [Robins] first choice" – and, indeed, the "essence" of the alleged agreement – is to *sell* Robins "one or more" Dumas works.  Robins says that he is "one of the largest collectors of [Dumas'] work in the United States, if not the largest."  (Robins Aff. ¶ 2)  He complains at length of supposedly being "blacklisted" by Dumas, and expresses his strong desire to resume buying her works in the primary market. (Id. ¶¶ 7-9, 13, 16-19, 21-22)  The obvious point of the alleged promise is not simply for Zwirner to "offer" Dumas paintings to Robins, but for Zwirner to sell one or more works to him.  Again, the alleged agreement is "to sell plaintiff a first choice."  (Pl.'s Br. at 8)  Because that is an agreement to sell goods priced over $500, the purported deal's failure to satisfy the Statute's sale-of-goods provision renders it unenforceable. See, e.g., Phoenix Ancient Art, S.A. v. Kimbell Art Foundation, 2003 WL 22705119 (S.D.N.Y. 2003) (rejecting claim based on alleged agreement to sell sculpture of Roman torso given that proffered documentation did not conform to Statute of Frauds); American-European Art Associates, Inc. v. Trend Galleries, Inc., 227 A.D.2d 170, 171, 641 N.Y.S.2d 835, 836 (1st Dep't 1996) (affirming rejection of claim based on alleged deal to sell Yves Klein painting given that plaintiffs "failed to demonstrate the existence of a signed written contract reflecting the terms and conditions of their purported purchase agreement").

**B.      The Alleged Agreement Is Too Vague to be Enforceable**

The alleged agreement is also void for vagueness.  "[F]or a contract to be valid, the agreement between the parties must be definite and explicit so their intention may be

11

ascertained to a reasonable degree of certainty." Candid Productions, Inc. v. International Skating Union, 530 F. Supp. 1330, 1333 (S.D.N.Y. 1982) (citations omitted). Put another way, "definiteness as to material matters is of the very essence in contract law. Impenetrable vagueness and uncertainty will not do." Joseph Martin, Jr., Delicatessen, Inc. v. Schumacher, 52 N.Y.2d 105, 109 (N.Y. 1981). This "rule applies with special force where," as here, "the extraordinary relief of specific performance is sought." Candid Productions, 530 F.Supp. at 1334.

There is no "definiteness as to material matters" in the supposed verbal agreement to give Robins "first choice, after museums," of "one or more" Dumas works. The alleged deal does not specify: (1) how many works Zwirner would sell to Robins; (2) at what price or price range the sale or sales would occur; (3) the duration of the agreement; (4) the time allotted to Robins to select or pay for a particular work or works; or (5) whether Robins would be given *his* "first choice" to buy whatever he wanted, or *the* "first choice" to buy a work or works selected by Zwirner. Under one reading, the supposed deal entitles Robins to buy one Dumas work, of Zwirner's choosing, at a price set by Zwirner. Under another reading, Robins is entitled to buy every single Dumas work now on display at the current show, other than those acquired by museums, and may pay only what that he deems commercially reasonable – rather than Zwirner's prices – while taking as long as he deems fit to make such payment.

"In such circumstances, the alleged [] agreement is void for vagueness: the parties failed to agree upon the essential terms." Brener & Lewis Management, Inc. v. Engel, 168 A.D.2d 254, 255, 562 N.Y.S.2d 488, 489 (1st Dep't 1990). While Robins might protest that he and Zwirner made the agreement in principle in 2005, and that the details of piece(s), price(s) and timing would be worked out later, "'a mere agreement to agree' is unenforceable for

indefiniteness where material terms are left open for future resolution." <u>Candid Productions</u>, 530 F.Supp. at 1336 (<u>quoting</u> <u>Joseph Martin, Jr., Delicatessen</u>, 52 N.Y.2d at 109). Indeed, the deal that Robins alleges is so "vague and indefinite that there is no basis or standard for deciding whether the agreement ha[s] been kept or broken." <u>Id</u>. at 1333-1334. After all, Zwirner offered to sell Robins a painting from the current Dumas show – "The Grapes of Plenty" – but Robins declined the work. (Robins Aff. ¶13; Ex. 8)

Thus, besides the fact that Zwirner did not make the agreement, even if he had it would be unenforceable under N.Y. Gen. Oblig. Law § 5-701(a)(1), unenforceable under N.Y. U.C.C. § 2-201(1)) and, moreover, void for vagueness. Robins has no likelihood of prevailing on his claims premised on this supposed agreement.

### C.    Zwirner Did Not Breach the Purported Agreement

Even if the supposed promise were found to have been made and enforceable despite the Statute of Frauds and the vagueness doctrine, Robins would still have no chance of success because Zwirner has not breached the agreement. Robins alleges that Zwirner promised to give him "first choice, after museums," to buy "one or more" Dumas works shown at David Zwirner Gallery. (Robins Aff. ¶ 8) Zwirner did just that: Robins was given the "first choice, after museums," to buy "The Grapes of Plenty," which is currently on display in the show. (<u>Id</u>. ¶13; Ex. 8) The fact that the work was not *Robins'* "first choice" does not mean that Zwirner breached a promise to give Robins *the* "first choice" to buy a Dumas work. Undoubtedly, Robins believes that the supposed deal was to give him *his* first choice, but such are the vagaries of verbal agreements. If Robins' claim was viable it would present a jury question at best, and factual disputes do not signal that success on the merits is likely. <u>See, e.g.</u>, <u>Marcy Playground, Inc. v. Capitol Records, Inc.</u>, 6 F.Supp.2d 277, 278 (S.D.N.Y. 1998) ("[P]laintiffs have not shown a strong likelihood of success on the merits because the facts critical to determination of

the action are sharply disputed."); Essa Realty Corp. v. J. Thomas Realty Corp., 70 A.D.3d 483,

483, 894 N.Y.S.2d 417, 418 (1st Dep't 2010) ("Plaintiff failed to show a likelihood of success on

the merits, as there are disputed issues of fact and dueling expert testimony.").

> **D.    Robins' "Blacklist" Claims are Not Actionable**

Robins asserts, again based only on his say-so: Dumas "literally blacklisted me

from purchasing any other work of hers in the Primary Market" after she learned of the sale of

"Reinhardt's Daughter."  (Robins Aff. ¶ 6)  Robins claims that part of Zwirner's supposed

promise to give him "first choice" at a future Dumas show was that he "would have access again

to [Dumas'] Primary work and [] would be taken off the blacklist."  (Id. ¶ 8)  Robins asks that

Zwirner be ordered to "remove plaintiff from the blacklist and provide plaintiff with access to

[Dumas'] Primary Market work."  (Compl. ¶ 22)

These requests are not actionable against Zwirner, who never agreed to endeavor

to remove Robins from any such list.  (Zwirner Decl. ¶ 17)  If such a list exists and if Robins is

on it, Zwirner did not put him there and cannot take him off.  Cf. Detroy v. American Guild of

Variety Artists, 286 F.2d 75 (2d Cir. 1961) (ordering labor union that blacklisted member

without charges or hearing to remove member's name from its list).  Robins' assertion that

Zwirner's telling Dumas of the "Reinhardt's Daughter" sale caused her to "blacklist" Robins is

equally infirm.  To whatever extent Dumas might have wished at the time that Robins not

acquire her work, that is a matter between Dumas and Robins.

In sum, Robins' claims of being "blacklisted" by Dumas are not actionable

against – or subject to remedy by – Zwirner.[2]

---

[2]    Moreover, although Robins complains of being put on a supposed "blacklist," nowhere in
his affidavit does he allege that he attempted at any time to purchase a work by Dumas in the
primary market and was turned down.

14

### E.    Robins' Fraudulent-Inducement Claims are Defective

Robins attempts to circumvent the flaws in his breach-of-contract claims by pleading fraudulent inducement. He alleges that, to "induce [him] to sell 'Reinhardt's Daughter,'" Zwirner "falsely and fraudulently" promised to "keep [Robins'] identity strictly confidential and not disclose [his] identity to the artist." (Compl. ¶ 42) Indeed, Robins says that confidentiality was a "material part of [supposed] sales agreement." (Robins Aff. ¶ 3) Robins also claims that, to "induce [him] to refrain from taking legal or otherwise [*sic*] action" over the disclosure of the sale of "Reinhardt's Daughter," Zwirner "falsely and fraudulently" promised that Robins would have "first choice, after museums, to purchase one or more [Dumas] works . . . , have access again to [Dumas'] Primary Market work and . . . be removed from the blacklist." (Compl. ¶ 30) Robins claims that Zwirner "never intended" to keep any of the alleged promises. (Id. ¶¶ 31, 43)

These claims have no merit. They allege only that Zwirner made promises he never intended to keep, and "[a]llegations that a party entered into a contract without intent to perform do not state a cause of action for fraud." Orix Credit Alliance, Inc. v. R.E. Hable Co., 256 A.D.2d 114, 115, 682 N.Y.S.2d 160, 161 (1st Dep't 1998) (citing New York Univ. v. Continental Ins. Co., 87 N.Y.2d 308, 318 (N.Y. 1995)). Moreover, because a "fraud claim that only restates a breach of contract claim may not be maintained," id., a "claim of fraud concerning a contract must allege misrepresentations . . . collateral to the contract." Id. (citing Deerfield Communications Corp. v. Chesebrough-Ponds, 68 N.Y.2d 954, 956 (N.Y 1986)). Here, the promises that Zwirner purportedly made to fraudulently induce Robins into the supposed deals are the very same promises alleged in Robins' breach-of-contract claims. Given Robins' failure to allege that Zwirner promised anything collateral to the supposed agreements –

15

for which Robins is already claiming breach of contract – Robins has no chance of prevailing on his claims for fraudulent inducement.

Thus, for multiple reasons, Robins stands no chance of prevailing on the merits.

### III.    THE BALANCE OF HARDSHIPS TIPS DECIDEDLY IN FAVOR OF ZWIRNER, NOT ROBINS

Finally, the balance of hardships in this case tips decidedly in Zwirner's favor. The hardship Zwirner faces is the encumbrance of an ongoing exhibition, the loss of potentially significant sales revenue and the frustration of business relationship with artists and clients alike. See Hessel, 399 F. Supp. 2d at 520.  Granting Robins' motion would subject Zwirner to all this – not to mention the added time, expense and stress of repelling a frivolous suit – based solely on one disgruntled man's completely undocumented claim to special treatment.  On the other hand, denying Robins' motion would at most "[d]ash [his] hope to own paintings that he does not actually own."  Id. at 519.  Put another way, Robins would be treated like any other consumer in the market.  Those are hardly burdens that tip the scale decidedly in Robins' favor.

This is a suit brought by a wealthy plaintiff displeased that he cannot get what he wants when he wants it.  He has offered nothing more than his own assurance that Zwirner made him a promise that, on its face, is absurd: a supposed pledge – when Zwirner did not even represent Dumas – that, if Zwirner ever did represent her and exhibit her work for sale, Robins would have "first choice, after museums" to buy "one or more" such works, without regard to price, quantity, competing buyers or duration of the purported promise.  Perhaps most strikingly, there is not a shred of documentation – no contract, no letter, no fax, no e-mail, no text message, no nothing – reflecting either this alleged agreement or the equally ludicrous one never to reveal the sale of "Reinhardt's Daughter," a million dollar work of art with a new owner who can make his, her or its own judgments about whether to exhibit or publish the work.

Robins is well-off art collector who is annoyed at not being given the special privilege to jump ahead of every other individual and buy whatever he wants from an exhibition. Having failed to persuade Zwirner to meet his demands, he has now enlisted this Court in an attempt to, as he puts it, "augment[] his [Dumas] collection."  (Pl.'s Br. at 6)  This suit is not a matter raising "sufficiently serious questions" making it "fair ground for litigation."  Citigroup Global Markets, 2010 WL 786584, at *3.  See, e.g., Consolidated Gold Fields, PLC v. Anglo American Corp. of South Africa Ltd., 713 F. Supp. 1457, 1475 (S.D.N.Y. 1989) ("Nor have plaintiffs shown sufficiently serious questions going to the merits . . . .  To the contrary, plaintiffs' securities claims are trifling . . . [and] look feeble and contrived.").

## CONCLUSION

For the foregoing reasons, the Court should deny Robins' motion for a preliminary injunction.

DATED:        April 5, 2010
              New York, New York

                                   PATTERSON BELKNAP WEBB & TYLER LLP


                                   By:   /s/ Peter C. Harvey
                                        Peter C. Harvey
                                        Jo Backer Laird
                                        Matthew B. Larsen
                                   1133 Avenue of the Americas
                                   New York, New York  10036
                                   Tel. (212) 336-2000
                                   Fax. (212) 336-2222

                                   *Attorneys for Defendants*

3877254v.1