Peter C. Harvey
Jo Backer Laird
Mathew B. Larsen
PATTERSON BELKNAP WEBB & TYLER
1133 Avenue of the Americas
New York, New York 10036
Telephone: (212) 336-2000

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| CRAIG ROBINS,<br><br>Plaintiff,<br><br>vs.<br><br>DAVID ZWIRNER,<br>DAVID ZWIRNER GALLERY, LLC,<br>AND DAVID ZWIRNER, INC.,<br><br>Defendants. | Civil Action No. 10- CV-2787<br><br>**DECLARATION OF MATTHEW B. LARSEN** |

I, MATTHEW B. LARSEN, hereby state as follows:

1. I am an attorney admitted to practice law in the State of New York and before this Court. I represent Defendants in the above-captioned action.

2. Attached as EXHIBIT A hereto is a true and correct copy of the transcript of proceedings in this action before the Honorable John G. Koeltl on March 30, 2010.

I declare under penalty of perjury that the foregoing statements are true.

MATTHEW B. LARSEN



EXHIBIT A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

CRAIG ROBINS,

Plaintiff,

v. No.

DAVID SWIRNER, DAVID SWIRNER GALLERY, LLC, and DAVID ZWIRNER, INC.,,

Defendants.

------------------------------x

New York, N.Y.
March 30, 2010
1:15 p.m.

Before:

HON. JOHN G. KOELTL,

District Judge

APPEARANCES

AARON RICHARD GOLUB, ESQUIRE, PC
Attorneys for Plaintiff
BY: AARON RICHARD GOLUB
DAVID LU

PATTERSON BELKNAP WEBB & TYLER LLP
Attorneys for Defendants
BY: PETER C. HARVEY
JO BACKER LAIRD
MATTHEW B. LARSEN

(Case called; in open court)

THE COURT: Good afternoon.

MR. HARVEY: Good afternoon, Judge.

THE COURT: Good to see you all. I know people at Patterson Belknap. Nothing about that affects anything that I do in the case.

This is the plaintiff's application for an order to show cause which includes a temporary restraining order and seeks to bring on a preliminary injunction. My understanding is that Judge Pauley would be prepared to hear the application for preliminary injunction on April 8, so that the only thing we're here on now is the temporary restraining order.

MR. GOLUB: One modification, Judge, which I will

argue.

THE COURT: I'm sorry?

MR. GOLUB: One modification to that, Judge, which I'm going to incorporate into my argument under Rule 65.

THE COURT: Okay. Fine. I'll certainly hear you.

MR. GOLUB: May I begin?

THE COURT: Sure.

MR. GOLUB: Thank you for hearing the case, your Honor. I know it's Judges Pauley's case, but I know you had the Bank of America case which is really not your case here too, and we don't want to burden the Court.

THE COURT: That's what we do. That's why we're here.

MR. GOLUB: Every time I walk into the courtroom I burden the Court and I apologize, your Honor, but I also have to make a living.

THE COURT: Hold on.

MR. GOLUB: That's the way it goes.

THE COURT: That's what we do. That's why we're here.

MR. GOLUB: I'm going to try to be as helpful as possible.

THE COURT: It's okay.

MR. GOLUB: Thank you, Judge.

Judge, this case can be described -- and I'm sure you read the papers -- legally in maybe 50 words or less, 40 words or less. Rule 65, simple contract. Rule 65 couldn't have said it better. Very simple issues. At the most, three witnesses. We should have an immediate trial.

The time we're going to spend next week on the preliminary injunction argument could be better served by calling my client to the stand, calling the defendant to the stand, Mr. Zwirner, and there's a third-party witness involved.

Story is simple: Breach of a confidentiality agreement. Same thing as in the One Card against Unisys case, breach of confidentiality. In exchange for you breaching confidentiality, Mr. Zwirner, now what are you going to do? Well, what Mr. Zwirner is going to do is he's going to enter into a contract in 2005 and the contract says to Mr. Robins,

I'm going to give you first choice if I get Ms. Dumas as a gallery artist. Doesn't violate the statute of frauds.

Three years passes. Ms. Dumas becomes a client of Mr. Zwirner. I don't know what machinations Mr. Zwirner went through to get Ms. Dumas as his client; he did.

And then what happens, he launches and mounts her show starting April 18 of this month and he breaches -- the first thing he does is beginning of this month, he breaches the agreement with Mr. Robins and instead of giving him first choice after museums, he says to him, finally, after Mr. Robins writes him an email on March 4, writes him another email -- which are in the exhibits -- on March 13, finally, as languidly as possible, Mr. Zwirner responds on the 15th of March and he says, Oh, well, I remember the dispute we had, but I don't really remember the agreement. I don't remember the agreement.

He doesn't deny the agreement. He simply says he doesn't remember it. That's the nexus and the crux of the trial. Let the Court and the jury, as we've asked for a

jury -- it would not be burdensome at all to put a jury together very quickly on the factual issues, your Honor, on the nonequitable relief on establishing a contract.

Mr. Zwirner takes the stand, under Rule 65(a)(2), my client takes the stand, and the third-party witness takes the stand. We can get all the discovery done this week and we're ready for trial. Why waste time with a preliminary injunction

hearing when all of that can be supplanted by what I've just described?

There's a limited amount of emails between them, and the contract was established and breached or there is no contract. We have a clear right to recovery here that I think we have a clear -- we've established irreparable harm because there's no question under state or federal law that paintings are unique.

So the first branch of getting an injunction, irreparable harm is met because irreparable harm is synonymous with uniqueness.

Second branch of likelihood of success on the merits, the Court is in the position to say from the papers -- we haven't seen any papers, by the way, from the opposition. I don't know even whether any papers or preliminary papers have been submitted. We asked for the papers last night. I never heard back from my adversary.

THE COURT: I usually don't get papers on the preliminary conference on a temporary restraining order because I call the parties in to try and set up a schedule and to talk about the temporary restraining order. Sometimes I get papers in opposition to the temporary restraining order, sometimes I don't.

So you were about to tell me about likelihood of success. Before you do that, let me just ask you, what are the

damages?

MR. GOLUB: The damages here are nonmonetary to a great extent, depending on how you view the causes of action.

THE COURT: Then why are you entitled to a jury?

MR. GOLUB: Well, we're entitled to the jury in the event -- we pled it alternatively. In the event the Court says that there is no irreparable harm here and denies the application for an injunction or preliminary injunction, then we alternatively would be entitled to damages. I'm leaving that to the Court's determination.

THE COURT: But you were asking for the trial on the merits to be consolidated with the trial on the preliminary injunction and you said it would be easy enough to get a quick jury and my question was --

MR. GOLUB: That would be quick jury on the -- if the Court chose -- on the claims that we do have some claims where there's monetary damages being sought on fraud. But on the specific performance, that would be a judge trial on the claim for specific performance.

THE COURT: Okay. Go ahead.

MR. GOLUB: And that's the centerpiece of plaintiff's claims, plaintiff's complaint. We want the paintings. We don't want money damages. We want the defendant to live up to

his obligations.

We already established, I believe, in the complaint

and in the motion, the second part of the aspect of Rule 65 that there's a likelihood of success on the merits here, your Honor.

We established there was a complaint made about the breach of the confidentiality in 2005. There was a rapprochement where the defendant admits in his email that there was a problem. He says, I do recall the problem we had in 2005. He is definitely alluding to the breach of confidentiality.

Secondly, in the next sentence he says, I don't remember the agreement. On top of that, compounding what evidence we have to show likelihood on the merits, your Honor, is that the defendant, he offered him a painting. Now, why would he even bother to offer him a painting? Because he knows he's got some obligation.

He's just trying to get away with giving him the painting that's hanging in the office, it's not even in the exhibit, and it's the worst painting in the exhibit, the one that's the least valuable; and it doesn't comply with the promise he made which is you get first choice after museums and that's a very big deal in the art world.

Art galleries try to sell their paintings, the paintings of their artists, in the primary market first to museums to establish the cachet for the painting or the reputation of the painting. After that they promise the work

to their best clients or to clients to whom they're obligated. And in this particular case, that's exactly what happened with Mr. Robins.

So we meet both branches of the requirements of injunctive relief and we don't have to get to the other aspects of injunctive relief, the tipping of the hardships or -- but we do meet the other requirement. If we didn't show likelihood on the merits, we certainly have shown that there's sufficient serious questions going to the merits here to warrant the issuance of a temporary restraining order.

And beside that, your Honor, the scales tip in our favor or the hardships tip in our favor. My client was made that promise. He's a major collector of Marlene Dumas' work. He also interacts with the public with his collection annually, and he's the largest collector possibly in the world of Marlene Dumas' work. If he doesn't have access to this, the collection will suffer.

And we are seeking, as in the Unisys case, the One Card against Unisys, this is very similar, your Honor. That was a software case. But in this particular case, paintings are unique, the promise was made. We don't want money. We want the painting and we want the defendant restrained.

I think what we're going to hear from the defendants today is, Oh, well, it's too late. The paintings have already been sold. If that's the case, if those paintings have been

sold, we want to be able to bring in all of those third parties to whom they allegedly sold the paintings that are hanging in that gallery to prove whether or not they've been invoiced or they're bona fide sales and whether or not any documents have been created ex post facto to create that impression.

Your Honor, with all due respect, we're entitled to the relief. Thank you. Unless you have questions.

THE COURT: No. Let me listen to the defendant.

MR. HARVEY: Good afternoon, Judge Koeltl.

Let's begin with irreparable harm. There is none here. And the best case that tells us that there is no irreparable harm is one decided in this very court. Hessel v. Christie's, Inc. We can find at 399 F. Supp. 2d 506, specifically 519 through 520.

In that case, Mr. Hessel had bid on works of art, paintings, at Christie's auction house. He had won the bid and was subject to the terms and conditions of the sale. He actually put money down on the paintings. The two paintings in question were one by an artist known as Koons and the other by Basquiat. Mr. Hessel didn't pay Christie's as he should have on time and, consequently, he lost the right to own the paintings.

He came into court, much like this plaintiff, asking for preliminary injunctive relief, asking for a temporary restraint, and the court said no. The court said no because

there was no irreparable harm. The court said no irreparable harm simply because a plaintiff's subjective desires to own a particular painting do not give rise to irreparable harm.

The court went further to say that to the extent that plaintiff can prove that it had an enforceable agreement and that somehow Christie's auction house didn't honor that agreement, the plaintiff would have a remedy in damages, and the court actually put a value on the paintings which it set forth in the opinion on page 520.

That is the situation in which this plaintiff, Mr. Robins, finds himself. There is no irreparable harm here. Essentially what he is claiming is a subjective desire to acquire a particular or several works by an artist, Marlene Dumas, and that just simply is insufficient as a matter of law.

To tell you something else, Judge, that's quite interesting, what is quite interesting is the agreement has changed. So even if you look at likelihood of success of the merits, look at what this plaintiff alleges.

THE COURT: Could I just stop you for a moment?

MR. HARVEY: Of course you may.

THE COURT: Plaintiffs says, Look, we had an agreement. I would have right of first refusal after museums with respect to specific paintings. From the plaintiff, he wants two paintings -- three?

MR. HARVEY: He identifies three in the complaint,

your Honor.

THE COURT: Identifies three. Plaintiff today says, Look, defendant is going to say those paintings are sold. Is that what the defendants are saying?

MR. HARVEY: No. We're not saying that. In fact --

THE COURT: Could I just -- you were going to say something "in fact"?

MR. HARVEY: In fact, but not related to that issue of whether -- the paintings have not been sold.

THE COURT: Because one of the things that was of interest to me in the papers is this show has been going on for some time and the plaintiff has not come in until now with respect to the show, and the show is going to continue into April when?

MR. HARVEY: I think it's the end of April, somewhere around the 24th of April.

THE COURT: Okay. And one would think that it would not be usual for a person to come in and say, I like that painting, I'm walking out -- here's my check for a lot of money for that painting -- I'm walking out with that painting. You would think that there's paperwork and the like with respect to the sale of valuable paintings.

MR. HARVEY: Correct.

THE COURT: Which would of course lead then to the next question whether the purpose of a temporary restraining

order is to prevent any irreparable injury until the preliminary injunction can be heard and a decision made on the preliminary injunction, whether Judge Pauley decides to merge a trial on the merits of the preliminary injunction is completely up to Judge Pauley, and I certainly want to hear what you have to say with respect to likelihood of success on the merits.

With respect to irreparable injury, if the defendants told me, Judge, there's going to be no final sale with respect to any of these paintings before Judge Pauley can hear this case, that, irrespective of how you view irreparable injury with respect to specific paintings, whether it is or is not irreparable injury, there would be no irreparable injury until Judge Pauley heard this on the merits of the preliminary injunction.

MR. HARVEY: Judge, there are no plans to sell any of these works prior to Judge Pauley hearing the matter next Thursday.

But we want to go to something more fundamental and that is a case of this type has already been decided in this court and in that decision the plaintiff alleged just what this plaintiff is alleging, in fact, with a stronger case.

That plaintiff had actually won two paintings at an auction and had put several hundred thousand dollars down on both paintings and was paying in increments but did not comply fully with the terms of the auction house and, therefore, lost

the right to hold the paintings, and the auction house put those paintings up for sale.

That plaintiff came into this court and said stop that auction house from offering for sale these paintings and the court said no.

THE COURT: I heard you the first time on that.

But if it's clear, for example, in that case that the plaintiff lost the right to get those paintings, I can understand why a colleague would have said, no, your right to

injunctive relief is gone.

If in fact the plaintiff here had an argument for likelihood of success on the merits that specific paintings as to which he had an alleged interest would be gone, there is an argument that that is property which is not replaceable. It's unique property.

MR. HARVEY: Judge, I think that's what the heart of the decision is, that it's not unique. There is nothing -- in other words, your subjective desire to want a particular item or particular work does not give rise to irreparable harm if, indeed, you want painting A and painting A is no longer available, the damage can be quantified. That painting, if it's been sold, has been sold at a price. And if you say I had a contract to buy that painting, it's been sold to someone else, there is a damage calculation for that, and I think that is the crux of the decision.

I think to move on to, secondly, the question of likelihood of success on the merits. If you look at what plaintiff is arguing in Exhibit 1 to his papers, he attaches an email dated March 4, 2010. He claims that the agreement was first choice of a painting after museums. That's what he claims. If you look at his affidavit, he claims that the agreement is something else. He claims it's first choice after museums and it's --

THE COURT: Hold on a moment.

MR. HARVEY: Yes.

THE COURT: Okay. I see the email and now --

MR. HARVEY: And now he claims in paragraph 8 of his affidavit beginning on -- it begins on page 3 but the operable language, the relevant language is on page 4. He claims that the agreement is something else.

He says he would have first choice -- I'm reading six lines down, actually five lines down -- he would have first choice after museums to purchase one or more such works at some future exhibition that had not been planned at the time this alleged agreement was made; that he would have access to Dumas' primary work, meaning directly from the artist, not buying in the secondary market; and, thirdly, that he would be taken off some believed or perceived blacklist, that he doesn't claim my client put him on, that is held by some third party.

So if we went to just pure contract principles with

respect to specificity of what the agreement is, he couldn't meet that threshold test because he says there's two different kinds of agreements. His own documents clash with respect to what he alleges the agreement is. That's No. 1.

No. 2 is any such agreement would violate the statute of frauds. Said this is the sale of a painting. It's a good, it's not a service. This is a painting. The UCC makes it quite clear that if you're going to have -- and UCC, specifically 201 says, quite clearly, if you're going to have the sale of goods, more than $500 worth, you have to have a writing signed by the party against whom you seek to enforce the contract.

Now, these paintings are worth several hundred thousand dollars, probably millions, and we are to believe that

this sophisticated art dealer didn't reduce this document, this alleged agreement, to writing and he didn't -- this is an agreement that he claims was reached in 2005 and here we stand in March of 2010. He can't produce a single writing to you of any kind except these email -- one email that begins in March of 2010 that begins to set up a lawsuit? He can't produce any writing prior to that?

Of course it violates the statute of frauds. And this is why our client said to him, we don't know the agreement you're talking about. We didn't make an agreement, No. 1. No. 2 is there's no record of any written agreement of any kind

to sell you anything.

And, thirdly, our client said to him, quite clearly, I would never have made an agreement to you or with you to sell you a work of an artist from a show that I didn't even have. I didn't even represent the artist at the time, so logic would dictate that I would never have made an agreement with you to sell you a work from an exhibition sometime in the future when I didn't even represent the artist and I had no idea that I would ever represent the artist at a particular point in time.

So with respect to likelihood of success on the merits, when he claims an enforceable contract, I don't think this contract is specific enough or would survive statute of frauds analysis such that one could say it's likely that the plaintiff would succeed on the merits with respect to this matter.

And so, Judge, our point of view is he doesn't prevail on irreparable harm, he doesn't prevail on likelihood of success on the merits, and then there's a third point, balance of hardships.

Part of what the court discussed in Hessel was this concept of hardship to the plaintiff who is claiming entitlement to two particular works of art versus hardship to Christie's, and the court pointed out there are some hardships to Christie's auction house. Those same hardships apply to our client, Mr. Zwirner. Specifically, the court discussed that

Christie's would have to take these paintings off sale. They would essentially be embargoed for a period of time, and the court thought that was unfair.

The court also thought that there are prospective bidders in the art world who traveled far, from far distances to make acquisitions, sometimes from overseas. That would be the case here where you would have people who are familiar with this artist's work, who are enthusiastic about this artist's work, who would fly into New York with the expectation that they would see something interesting, and somehow these works would no longer be available.

And the court looked at those hardships and said these are some real hardships. And so the court in Hessel said it could not conclude there were no hardships in Christie's favor or that the balance of hardships weighed in favor of the plaintiff there. We think that's the case here. The balance of hardships is even at best and, if anything, it weighs in favor of not granting the TRO.

But as we made it clear to the Court, there are no

plans as of right now to sell anything between now and when Judge Pauley will hear it. The Court also asked that we address this question of consolidation.

THE COURT: Would you undertake to notify the Court if you were going to sell one of the paintings?

MR. HARVEY: Yes, sir. We certainly would, Judge.

This idea of collapsing a trial into a preliminary injunction and final injunction hearing is impractical and not useful. Our client spoke with the plaintiff last week and told the plaintiff that he would be overseas this week. We find it interesting, to say the least, that this application was filed while the plaintiff knows that our client is overseas. He is not here and he won't be back until Sunday or Monday. So to suggest a consolidated trial this week is a bit disingenuous, that's No. 1.

No. 2 is a consolidated trial is unnecessary because and, to us, impractical, because we haven't had an opportunity to even file papers in this case, and I think that we should be given the opportunity to brief the issues. I'm sure Judge Pauley will want to hear what we have to say and look at our recitations of the law.

I think, lastly, there's the matter of taking some discovery before we impanel a jury and ask a jury to begin to assess the credibility of various witnesses.

We think, as the Court does, that this is really a damage case. This isn't an equitable relief case. This is a damage case. These are paintings. If you lose a right to get a painting, you put a value on it because the painting was sold at a price and you come in and say, I should have gotten that particular painting at that particular price, and the jury says, yes, you should have, or no, you shouldn't have.

So we think it's impractical. We think that this should proceed as an ordinary, garden variety, plain vanilla civil action because that's what it is. We should be given an opportunity to file papers. We do not believe a TRO should be entered for any reason, for the reasons we've outlined, and we believe that the matter should just be placed on the regular calendar and handled as an ordinary civil action.

Thank you for your time.

THE COURT: Certainly. Thank you.

MR. GOLUB: May be I heard, your Honor?

THE COURT: Sure.

MR. GOLUB: The Hessel case is about as far afield as you can get from the facts in this case. What happened in the Hessel case, and I think that the reason he's citing the Hessel case is because his cocounsel, Ms. Laird, used to be in-house counsel for Christie's so they're familiar with the Hessel case.

But what happened in Hessel, and I see my adversary didn't take the time to explain the real facts in Hessel, Mr. Hessel bought a Basquiat painting and a Koons painting at auction. That's already the secondary market which makes the case distinguishable. It's not the primary work of the artist. It's just the works you find in a gallery. Anybody in the world can go into Christie's or Sotheby's or Phillips and bid

on a painting. That's a different kind of painting.

And as a footnote to that, my adversary I think is a hundred percent wrong on paintings not being unique. There's not a case in New York or I think in any other state in the United States that's ever said paintings are not unique. Under 7102, 7109 of the CPLR, 7109 dead bang on, that's right in the statute, it's a unique chattel. And there are two cases on that in the state of New York that I could refer my revered adversary to that he could study up on what is a chattel, what is the meaning of chattel, and paintings absolutely classify under that and under the One Card against Unisys case.

But not to belabor the point about paintings being unique, what happened in Hessel was Mr. Hessel bought these two paintings at auction. The terms of sale at Christie's is you've got to pay for those paintings within seven or eight days after the auction. Mr. Hessel didn't pay at all. Later on, Mr. Hessel -- the total amount of the paintings were I think $1,800,000 or $1,700,000 that he bid for at auction. Then he put up a million dollars.

Then Christie's hounded him to pay the rest of the money and dragged out over a period of a year and a half. Then he got someone to come in and put up a half a million dollars for him. He never paid the full amount. And, finally, when Christie's had exhausted every overture they possibly could have, they finally sold the paintings.

Then he came in and asked for a temporary restraining

order. He asked for an injunction later on because the paintings were unique. Too little too late. I don't know how they can possibly use that as an analogous case or they want to lead with that case to destroy our argument of irreparable harm because the case is so far afield I can't comment enough on it.

The other part of this, this is a contract that's not for the sale of goods necessarily. It's a contract that once you have a show, you will offer me first choice. It's not you sold me a painting and that sale of the painting should have been in writing under the UCC.

And that contract -- there's nothing inconsistent with what my client claims. My client sent the email on the 4th. He doesn't have to explain every single aspect of his contract in his email. He told him clearly I have first choice after museums. He didn't have to go into the other aspects of it.

THE COURT: Could I ask a question?

MR. GOLUB: Sure.

THE COURT: In his affidavit he wants three paintings?

MR. GOLUB: He wants one or more paintings, your Honor. He names the three paintings he wants to choose from.

THE COURT: Well --

MR. GOLUB: I believe he says in the last paragraph.

THE COURT: Why doesn't he just buy them?

MR. GOLUB: Because they won't sell them to him. This is the way galleries work in New York, Judge.

What they do is they hold on to these paintings for their favorite customers -- and this may even be some kind of a violation of antitrust because it's a vertical conspiracy in a way that what they do is they want to put the paintings in the hands of customers who buy other paintings from them or they want to put it in the hands of someone who's not going to sell it, thereby suppressing anybody's willingness to go into the marketplace and try to buy one of these paintings unless they're extremely rich and they're going to bid an incredibly high price for them.

This is the way the art market works. Galleries sell paintings to people who are very rich, who they believe are not going to sell the paintings.

THE COURT: If he's given the right, under this alleged contract, if he's given the right to first refusal, first refusal to pay how much?

MR. GOLUB: It's a million -- each one of those paintings is about a million three.

THE COURT: But if the gallery has another potential purchaser who's prepared to pay more --

MR. GOLUB: That's not the way it works in the primary market.

THE COURT: Just try and answer my question and then tell me what, you know. You said they're keeping these paintings for their preferred customers. So, another customer

is there prepared to pay more than your client. They have to give your client the painting under your view of the contract?

MR. GOLUB: I wouldn't think so. But, however, I wouldn't think so. However, I would think so because it doesn't work that way.

When you have a show, a primary show, the prices are set. If someone else comes in and offers the gallery more for that painting -- the galleries don't work that way. The prices are set. They're going to sell it. They're going to tell their best customers, we're selling these Marlene Dumas paintings, they're all a million three.

Where they restrain trade and where they suppress -- let me not say suppress -- but where they discourage competition, so to speak, is that they put the paintings in the hands of people who are so rich they'll never sell the painting and thereby the price of the painting is made more desirable when she comes out with new paintings and it drives the price up. If there's no supply, then demand goes up and thereby the price goes up.

When a gallery has a primary show, Judge, no gallerist will say Mr. Jones came in and offered me more. Those primary market prices are set at the outset of the show.

However, Judge, if you walked into the David Zwirner gallery and said, by the way, I happen to really like this show. My name is Judge Koeltl. I happen to be a judge at the

Southern District of New York, and I'd like to buy one of those paintings. I can guarantee you that they would not sell you the painting. And if I walked in there --

THE COURT: They wouldn't sell me because they don't sell paintings to judges or because I wouldn't have the money

to pay for it?

MR. GOLUB: No, because you're not on their preferred list of clients and neither am I. They have a preferred list of clients and that's what galleries do throughout the world. They sell -- a Marlene Dumas painting is hard to come by in the secondary market. It's hard to come by in the primary market. She's had three shows since 1994. She's had only one show in New York and that was in 1991.

Her paintings -- she is not an artist that has a great output, and the fewer painting she paints, the higher demand for her work which makes the argument of rareness and uniqueness that much stronger.

With respect to something else that the defendant has argued is that Mr. Zwirner is out of the country, evidently, and what I said was we would be prepared to work night and day next week to give them whatever discovery they want and to be prepared for trial next Thursday.

And since they've more or less said the status quo is not going to change, there's not even a need for a TRO if they're going to represent to this Court that those paintings

won't be sold in the interim. So that would make things a lot more pliable for everybody, your Honor, if my adversary is making that commitment.

THE COURT: With all respect, as they say, that doesn't make any sense. You're right. They've mooted the request for the temporary restraining order because they've said the paintings aren't going to sold without prior notice to the Court, and it was unrealistic to think that someone is going to come into the gallery and close a sale between now and the time that Judge Pauley can hear the case, but they made the representation in any event.

But what you're asking me to do is to say, Okay, tell Judge Pauley, as soon as Judge Pauley gets back, hold a trial on this case, consolidate the trial on the preliminary injunction with a trial on the merits without Judge Pauley having had the opportunity to listen to the arguments, listen to the papers, whether Judge Pauley thinks that there's a necessity for discovery and whether he really thinks that this is a case that he should consolidate for trial.

There are, on its face, there are issues between the parties which would warrant discovery. Was there an agreement? What are the terms of the agreement?

There's an issue between the parties with respect to whether this is a case that requires a jury or not a jury because there's an issue as to whether there are damages or no

damages being sought, and a court is less likely to consolidate a hearing on a preliminary injunction with the final trial on the merits if it's a jury trial, but that's a decision for Judge Pauley.

So it would not be reasonable for me to foreclose all of those issues for Judge Pauley and say, come back, here, have a trial on the merits.

MR. GOLUB: Well, it is a problem that Judge Pauley was out of town yesterday and we could have made today's arguments in front of him. It would have been far more --

THE COURT: I suspect, if I had the case -- and I don't foreclose anything that Judge Pauley may decide to do. It would not be a case where not even had a -- not even a response on the temporary restraining order, not an answer from the defendant, and some lack of urgency on this with the lack of a seller out there beating down the doors to get these paintings, a lack of urgency to have an immediate trial.

I mean those are the kinds of factors that I would have taken into account to not order an immediate consolidated trial on the merits with the preliminary injunction, and you're right, I'm not going to do it to Judge Pauley.

But I'm telling you that I would -- there would be questions if the case were before me for all purposes whether I would consolidate the trial on the merits with the preliminary injunction.

MR. GOLUB: I'd like to clarify one thing, your Honor, is that is my adversary saying that between now and then that they're going to maintain the status quo or they're saying if they get a sale, they're going to simply come to the Court and report it?

THE COURT: No.

MR. GOLUB: Because then my application for the TRO then continues. If they are saying, you know, they are not -- and one other thing I'm not clear about is have any of these paintings, am I clear that none of these paintings have been sold? Is that clear?

MR. HARVEY: Your Honor, aside from the fact that I don't think it's the plaintiff's business, in the interest of being helpful to the Court, I'll tell you that no, none have been sold.

MR. GOLUB: Are any of the paintings on reserve? That's what reserve means --

THE COURT: Mr. Harvey was forthcoming on two things and, you know, you can go and do your discovery. But he explained to me, and it was something that I did ask and would expect to get a response: Have any of the paintings been sold? No. Will any of the paintings be sold without prior notice to the Court? No.

That is sufficient for me for purposes of the temporary restraining order. Should the status quo change,

Mr. Harvey undertakes to notify the Court. Period.

MR. GOLUB: I get that, your Honor.

MR. HARVEY: That's correct, your Honor.

MR. GOLUB: I don't think there's anything else to say until next Thursday based on that, your Honor.

THE COURT: Okay. But I should give you a schedule. So, the application for a temporary restraining order is denied as moot based upon the representations to the Court.

The preliminary injunction is scheduled for April 8 before Judge Pauley at 10 a.m., unless Judge Pauley advises the parties that he's set a different time or date.

Responsive papers on the preliminary injunction are due April 5. Reply papers are due April 6.

MR. GOLUB: Could you give us a time on April 5, your Honor?

THE COURT: Sure. April 5, 5 p.m., and April 7, 5 p.m. Papers are to be served by fax on each other and --

MR. GOLUB: How about email, Judge?

THE COURT: Email. The case should be on ECF, so papers served by ECF, and so Judge Pauley will be able to get them from ECF.

MR. GOLUB: So we have until the 7th to get our reply back to them?

THE COURT: Right. Five p.m., April 7.

MR. HARVEY: Your Honor, may I just raise a question

with April 8. I'm caught just in a bit of a scheduling problem. I have to be in another court at 1:30.

THE COURT: On April 5?

MR. HARVEY: On April 8, at 1:30, in New Jersey. And I raised that because I don't know how Judge Pauley wishes to proceed on April 8. If it's merely a status at ten, that's not a problem. If he wishes to proceed more extensively, it will put me in a bit of a problem in the sense that the court in New Jersey has given our client more than one adjournment and this is a preemptive date. So it won't go longer than the afternoon, but I know I have to be there at 1:30 or else I will have trouble. I'm sorry.

THE COURT: That's all right. I've been given April 8 as the date when Judge Pauley would hear the motion. What I would do if I were you is to write a letter to Judge Pauley and either ask for guidance as to how long the hearing on April 8 might last. I don't know if Judge Pauley wants an evidentiary hearing on April 8 or not, or asking that it be put over until April 9 or another convenient date for the Court.

MR. HARVEY: Thank you. That's helpful.

THE COURT: Okay. Good to see you all.

MR. GOLUB: Thank you, Judge.

oOo