Peter C. Harvey
Jo Backer Laird
Mathew B. Larsen
PATTERSON BELKNAP WEBB & TYLER
1133 Avenue of the Americas
New York, New York 10036
Telephone: (212) 336-2000

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------X
CRAIG ROBINS,

        Plaintiff,                    Civil Action No. 10- CV-2787

vs.                                  **DECLARATION OF DAVID ZWIRNER**

DAVID ZWIRNER,
DAVID ZWIRNER GALLERY, LLC,
AND DAVID ZWIRNER, INC.,

        Defendants.
-------------------------------------------------------X

        I, DAVID ZWIRNER, hereby state as follows:

        1.     I am an art dealer and the owner of David Zwirner Gallery ("the Gallery") having an address, at 525 West Nineteenth Street, New York, New York. The Gallery is located in the Chelsea section of New York City. I submit this Declaration in opposition to the Order to Show Cause filed by plaintiff Craig Robins. I have personal knowledge of the facts set forth in this Declaration.

        2.     The Gallery displays and sells works of art. It represents a large number of highly-regarded contemporary artists. Additionally, from time to time, the Gallery sells works in the secondary market (namely, the sale of previously owned works of art) by artists who are not represented by the Gallery.

        3.     Marlene Dumas ("Dumas") is a South African contemporary artist who lives and works in the Netherlands. She is a highly sought-after artist.

4. In late October of 2004, Craig Robins began discussions with my gallery about the potential sale of a painting owned by him by the artist Marlene Dumas titled "Reinhardt's Daughter" (the "Work"). At the time, Ms. Dumas was represented by the Jack Tilton Gallery. It was my understanding that Robins was an art collector who collected, among other things, work by Ms. Dumas. Mr. Robins approached my gallery with the stated goal of realizing a substantial profit through the sale of this painting. Mr. Robins had other relationships with New York based galleries at the time, but it is my understanding that he chose to conduct the sale through my gallery based on his belief that we would be able to produce the intended results.

5. On November 8, 2004, the gallery sold the Work to a Swiss gallery which purchased it for the purpose of re-selling it to a private Swiss client. The sale price of the Work, as reflected on the invoice that I sent to the Swiss gallery on November 15, 2004, was $925,000.00. (See attached EXHIBIT A)

6. On December 2, 2004, in connection with the sale of the Work, and at the request of Mr. Robins, I signed a document titled "Robins Exchange No. 1004," which included a section titled "Relinquished Property Contract ('Sales Agreement')." (See attached EXHIBIT B) The "Robins Exchange No. 1004" did not contain any confidentiality provision with respect to any aspect of the successful sale of the Work or the sales transaction. The "Robins Exchange No. 1004" indicated that Mr. Robins intended to use the sales of the Work as part of a so called "like-kind exchange" under Section 1031 of the Internal Revenue Code. We then transferred $925,000 as payment for the painting on December 8, 2004 to an account held by the Chicago Deferred Exchange Corporation. The document titled "Robins Exchange No. 1004" is the only

2

3877554v.1

document that reflects the agreement between Mr. Robins and me or the Gallery relating to the sale of Reinhardt's Daughter.

7. Mr. Robins expressed his gratitude to us for the way the transaction was handled, as he had realized a significant profit and was paid in a timely fashion.

8. It is the customary practice among art dealers that, during the time that a purchase or sale of art is being negotiated, the transaction is kept confidential so as not to disrupt the negotiations or harm the value of the work. By contrast, once an artwork is sold, particularly a work of substantial value, the confidentiality of the fact of the sale is no longer within the control of the seller. The new ownership of the work is as public or as private as the new owner wishes to make it.

9. During the time that the sale of the Work was being discussed, I did not disclose the fact that the sale was being contemplated, or the terms that were being negotiated, with any person other than the parties involved in the transaction. The sale of the Work was extremely successful.

10. I did not enter into any confidentiality agreement, written or oral, with Mr. Robins.

11. Unlike many other contemporary artists, Marlene Dumas maintains the archive of her work by herself, with the help of her employees at Studio Dumas. She does not, as is often customary, leave the responsibility for her archive to one of her galleries. Marlene Dumas and Studio Dumas expect all galleries who sell her work to report the owners of her work to Studio Dumas to ensure that her archive is complete and up to date. This is important for a number of different reasons, including being able to locate the art when museums want to borrow it for exhibition. For example, the Museum of Modern Art included "Reinhardt's Daughter" in a

3877554v.1

Marlene Dumas retrospective at Museum of Modern Art that opened on December 14, 2008. The loan requests by the Museum of Modern Art were processed through Studio Dumas. It is my understanding that requests by museums for loans of art for major exhibitions generally occur as much as two to three years prior to the exhibition.

12. Similar to many contemporary artists, Ms. Dumas does not want collectors to speculate in her works of art or "flip" them for profit's sake. It is in her interest that her works be sold to important private and museum collections that both contribute to the works' art historical value and enhance her artistic career. She is especially grateful if private collectors decide to donate her work to public institutions or help public institutions purchase her work through charitable gifts.

13. Subsequent to the November 8, 2004 sale of the Work to a Swiss gallery, I informed Marlene Dumas about the change of ownership of "Reinhardt's Daughter." I let it be known to the Studio Dumas that the Work now belonged to a private Swiss collector, who would be willing to loan it to important exhibitions if necessary.

14. On May 13, 2005, Mr. Robins contacted the Gallery with a phone call and threatened to commence litigation against me seeking $5 million to $10 million in compensation for damages which he alleged I had caused him by having revealed his name as the seller of "Reinhardt's Daughter" to Studio Dumas. Robins claimed that he was now no longer able to purchase any of Marlene Dumas' work in the primary market. (i.e., the first time the artist sells a work). Mr. Robins claimed that I had "taken money out of his pocket."

15. Later that month, after the Gallery had received at least one additional threatening phone call from Mr. Robins, he agreed to meet me in my office. The two of us spoke at length about the business at hand, but also spoke more casually about our respective families,

3877554v.1

Mr. Robins' recent divorce, and the art world in general. I expressed regret about the fact that he felt that the Gallery had caused him harm, even though we had successfully sold the Work. I stated that I would be open to a business relationship of some kind or another in the future. It was clear to me that he wanted to buy works from the Gallery with high speculative value. I told Mr. Robins that I was in principle willing to sell him other unspecified works from upcoming exhibitions of artists that I represented at the time, whose work was in high demand and for whom there were waiting lists. It was my understanding that after this private conversation we had reconciled.

16. To the best of my knowledge after this discussion, Mr. Robins has never enquired about any available art works from my gallery, even though he has received invitations to our gallery openings.

17. I never promised or stated to Mr. Robins that I would sell him a painting by Marlene Dumas. Additionally, I never promised or stated to Mr. Robins that I would give him first pick or a right of first refusal after museums for any works by Dumas from any show of her art. I never promised or stated to Mr. Robins that if I were ever to represent Ms. Dumas, I would assure that he would have access to her work in the primary market, or that I would get his name removed from any so-called "blacklist." As he was well aware at the time of our discussion, I did not represent Marlene Dumas at that time and could not possibly have made any promises in regards to her work. In fact, I only came to represent her in April 2008, three years later.

18. I did not sign any writing, and no writing exists that is signed by me, in which I agree to (i) sell Mr. Robins any work by Ms. Dumas, (ii) give him first pick or a right of first refusal for any works by Dumas from any show of her art, (iii) assure that Mr. Robins have

3877554v.1

access to Dumas' work in the primary market, or (iv) get his name removed from any so-called "blacklist."

19. Since 2005, Mr. Robins and I have conducted further business together. In August of 2005, shortly after our meeting, Mr. Robins offered us a painting for sale from his collection entitled "Chloe" by Elizabeth Peyton. In September 2005, Mr. Robins consigned a work for sale to the Gallery by the artist Chris Ofili to be presented at Frieze Art Fair in October 2005. In March of 2006, he then offered the Gallery the opportunity to purchase a 50% interest in this work. I agreed to purchase this interest primarily to ensure that this work by an artist whom I represent not be sold at auction. Mr. Robins and I are partners in the ownership of this work by Chris Ofili since April 19, 2006. Most recently, in October 2009, Mr. Robins offered us the opportunity to sell a work by Marcel Duchamp on his behalf.

20. As stated above, Ms. Dumas did not join my gallery until April 2008. The Gallery sent out a card announcing the representation of Marlene Dumas on June 11, 2008.

21. On March 18, 2010, we opened our first Dumas show titled "Against the Wall," which will close on April 24, 2010.

22. At no time during any contact with Mr. Robins since the spring of 2005, including our joint ownership of the work of the artist Chris Ofili, has Mr. Robins ever asserted or claimed that we had a purported agreement of any kind regarding any work of Ms. Dumas. Most notably, at the time that Ms. Dumas joined my gallery, Mr. Robins did not say anything to me about any purported agreement. The first time any such assertion was made was in his email to me dated March 4, 2010.

3877554v.1

I declare under penalty of perjury that the foregoing statements made by me are true to the best of my knowledge.

_____
DAVID ZWIRNER



# EXHIBIT A

# David Zwirner

525 West 19th Street  Fax 212 727 2072
New York, NY 10011  Telephone 212 727 2070

Iwan and Manuela Wirth  Invoice #3701
Galerie Hauser & Wirth  November 15, 2004
Limmatstrasse 270
CH-8005 Zurich
SWITZERLAND

## INVOICE

MARLENE DUMAS  $925,000.00
*Reinhardt's Daughter*, 1994
Oil on canvas
78.74 x 39.37 inches
200 x 100 cm

DUMMA0033

                                  Plus Commission:    $46,250.00

No New York State Sales Tax, Out of country

                                              **Total:**    **$971,250.00**

Title does not pass until payment has been made in full.

Any applicable shipping, packing and/or framing charges will be billed separately.

Thank you.
Please send a wire transfer to:
Merrill Lynch
New York, NY
Routing No. 026009593
SWIFT Code: BOFAUS3N
Account No. 6550113516
Account Name: Merrill Lynch
Further credit to:
Merrill Lynch Account No. 852-07361
Merrill Lynch Account Name: David Zwirner, Inc.

**EXHIBIT B**

Robins Exchange No. 1004                                    [Use for Sale]

I. **Relinquished Property Contract ("Sales Agreement")**

   Seller:      Craig Robins

   Purchaser:   DAVID ZWIRNER

   Sale Date:   DEC. 2ND, 2004

   Property:    [ ] Describe Artwork and Artist: MARLENE DUMAS – "REINHARDT'S DAUGHTER"–oil on canvas

   Sale Price:  $925,000.00

   Seller agrees to sell, and Purchaser agrees to purchase, the Property on the terms above. The sale and purchase shall not close until delivery of the Property to Purchaser.

   Purchaser: _____          Seller: _____
   Print Name: DAVID ZWIRNER                    Craig Robins

II. **Assignment.** For value received, Seller hereby transfers, sets over and assigns all his right, title and interest (but not his obligations) in and to the above Sales Agreement to Exchangor under the Exchange Agreement.

    Seller

    _____                    _DECEMBER 2ND_, 2004
    Craig Robins                                Date

III. **Notice to Purchaser.** Purchaser is hereby notified that all of Seller's right, title and interest (but not Seller's obligations) in and to the Sales Agreement have been assigned to Chicago Deferred Exchange Corporation ("Exchangor") under an Exchange Agreement dated at or prior to the Sale Date (the "Exchange Agreement") between Seller and Exchangor.

    Purchaser: _____          Seller: _____
    Print Name: DAVID ZWIRNER                    Craig Robins

IV. **Acceptance and Direction To Convey.** Exchangor accepts this Assignment of Seller's right, title and interest (but not Seller's obligations) as of the Sale Date, and exercising its discretion under Article Three, Paragraph F of the Exchange Agreement, hereby directs the Seller to transfer and convey, on behalf of, and consistent with the rights of the Exchanger under the Exchange Agreement, the Property directly to the Purchaser.

    Chicago Deferred Exchange Corporation

    By: _____                 12/2, 2004
    Its: Vice President                          Date

C:\DOCUME~1\Mayda\LOCALS~1\Temp\SALES AGREEMENT-004.docC:\DOCUME~1\Mayda\LOCALS~1\Temp\SALES AGREEMENT-004.doc