Peter C. Harvey
Jo Backer Laird
Mathew B. Larsen
PATTERSON BELKNAP WEBB & TYLER
1133 Avenue of the Americas
New York, New York 10036
Telephone: (212) 336-2000

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------X
CRAIG ROBINS,

    Plaintiff,       Civil Action No. 10- CV-2787

  vs.          **SUPPLEMENTAL DECLARATION OF**
             **MATTHEW B. LARSEN**
DAVID ZWIRNER,
DAVID ZWIRNER GALLERY, LLC,
AND DAVID ZWIRNER, INC.,

    Defendants.
---------------------------------------------------X

  I, MATTHEW B. LARSEN, hereby state as follows:

  1.  I am an attorney admitted to practice law in the State of New York and before this Court. I represent Defendants in the above-captioned action.

  2.  Attached as EXHIBIT A hereto is a true and correct copy of the transcript of proceedings in this action before the Honorable William H. Pauley III on April 14, 2010.

  I declare under penalty of perjury that the foregoing statements are true.

DATED: April 20, 2010
   New York, New York          MATTHEW B. LARSEN

# EXHIBIT A

```
        04EKROBC                Conference
 1    UNITED STATES DISTRICT COURT
 1    SOUTHERN DISTRICT OF NEW YORK
 2    ------------------------------x
 2
 3    CRAIG ROBINS,
 3
 4                  Plaintiff,
 4
 5            v.                              10 CV 02787 (WHP)
 5
 6    DAVID ZWIRNER, et al.,
 6
 7                  Defendants.
 7
 8    ------------------------------x
 8                                             New York, N.Y.
 9                                             April 14, 2010
 9                                             10:00 a.m.
10
10    Before:
11
11                   HON. WILLIAM H. PAULEY III,
12
12                                             District Judge
13
13                            APPEARANCES
14
14    AARON RICHARD GOLUB, ESQUIRE, PC
15         Attorneys for Plaintiff
15    AARON RICHARD GOLUB
16    NEHEMIAH S. GLANC
16
17    PATTERSON BELKNAP WEBB & TYLER, LLP
17         Attorneys for Defendants
18    PETER C. HARVEY
18    JO BACKER LAIRD
19
19
20
21
22
23
24
25
              SOUTHERN DISTRICT REPORTERS, P.C.
                      (212) 805-0300
```

                                                                        2
```
      04EKROBC                Conference
 1           (In open court)
 2           THE DEPUTY CLERK:  Robins versus Zwirner.  Counsel for
 3    the plaintiff, please state your appearance.
 4           MR. GOLUB:  Aaron Richard Golub.
 5           THE COURT:  Good morning, Mr. Golub.
 6           MR. GOLUB:  Good morning, Judge.  How are you?  This
 7    is Mr. Glanc, also for the plaintiff.
 8           THE DEPUTY CLERK:  Counsel for defendant, please state
 9    your appearance.
10           MR. HARVEY:  Good morning, your Honor.  Peter Harvey
11    of Patterson Belknap here on behalf of all defendants.
12           MS. LAIRD:  And Jo Backer Larid, with Patterson
13    Belknap.
```

| | |
|---|---|
| 14 | THE COURT: Good morning. |
| 15 | MS. LAIRD: Good morning. |
| 16 | THE COURT: This case was filed when I was out of the |
| 17 | district and you all spent some time before the Part I judge. |
| 18 | Yesterday I received a copy of a first amended complaint. |
| 19 | Mr. Golub, do you want to tell me what's going on? |
| 20 | MR. GOLUB: We amended the term -- in terms of the |
| 21 | first amended complaint or in general? |
| 22 | THE COURT: In general. |
| 23 | MR. GOLUB: Plaintiff in this case is an art collector |
| 24 | and lives in Miami; he's one of the most well-known art |
| 25 | collectors of his generation; he's about 48 years old; he |

04EKROBC                    Conference

| | |
|---|---|
| 1 | exhibits his work throughout the United States, to the public, |
| 2 | and he also has exhibitions in Miami. One of the primary |
| 3 | artists he collects is Marlene Dumas. And he's been collecting |
| 4 | Marlene Dumas since the early 1990s and buying her work in |
| 5 | what's called a primary market. The primary market, as we |
| 6 | explain in the papers, is the first time an artist creates work |
| 7 | and the first time the work is sold in a gallery, that's the |
| 8 | primary market; that's the first time the work is available for |
| 9 | purchase. After that, the work goes into the secondary market |
| 10 | and it's also sold through galleries but anybody can usually |
| 11 | buy that work at auction or buy it through a dealer. But these |
| 12 | works are seminal works, and they're also conceptual in the |
| 13 | sense that Ms. Dumas' show at the David Zwirner Gallery, |
| 14 | defendants' gallery, is based on a specific concept called |
| 15 | "Against The Wall," which relates to the Wailing Wall in |
| 16 | Jerusalem. And this, as we argue in our papers, is a high |
| 17 | watermark for Ms. Dumas, and it's a very controversial show, |
| 18 | because her previous work, a lot of her previous work, involved |
| 19 | depicting terrorists; this work depicts kind of an Arab-Jewish |
| 20 | conflict throughout a lot of these paintings, with a decided |
| 21 | sympathy, after reading the text in the catalogue which we |
| 22 | provided to the Court, a sympathy toward the plight of the |
| 23 | Palestinians. And it's important that any collector of |
| 24 | plaintiff's stature own one of these particular paintings. |
| 25 | And in 2004, the plaintiff sold in the secondary |

04EKROBC                    Conference

| | |
|---|---|
| 1 | market a painting by Marlene Dumas called "Reinhardt's |
| 2 | Daughter," and he sold it through the defendant Mr. Zwirner. |
| 3 | And one of the material conditions of the agreement between the |
| 4 | two of them was that confidentiality had to be maintained, that |
| 5 | Mr. Robins didn't want Ms. Dumas to find out that he had sold a |
| 6 | painting in the secondary market because of her sensitivity in |
| 7 | her market. She wants to very much control the supply and |
| 8 | increase the demand; and by doing that, she kind of insists on |
| 9 | maintaining a blacklist of people who sell her paintings. And |
| 10 | also she wants paintings given to museums and she wants people |
| 11 | to stay in very wealthy collectors' collections. And by virtue |
| 12 | of that, it's almost a sure guarantee, with an artist of her |
| 13 | stature, that the prices will go up. |
| 14 | And what Mr. Zwirner did was he breached that |
| 15 | agreement because he was trying to ingratiate himself. It was |
| 16 | known for a long period of time he was trying to ingratiate |
| 17 | himself with Ms. Dumas, because she's a very, very sought-after |
| 18 | artist. In the last seven or eight years, her paintings have |

19  gone from $10,000 a painting, for a large picture, to almost --
20  I think her highest price in the last four or five years has
21  been 3.2 million or 3.6 million dollars. And with that kind of
22  notoriety and economic success, she's now tried to advance that
23  into another arena, which may be in the 5 to 10 million-dollar
24  range. And by dealing with the economics, that's how a lot of
25  dealers and that's how a lot of artists manage to transition
             SOUTHERN DISTRICT REPORTERS, P.C.
                      (212) 805-0300

                                                                5
   04EKROBC                    Conference
1  their work to higher prices.
2            THE COURT: How could Mr. Robins think that any sale
3  in the secondary market would remain confidential when he
4  didn't know who the purchaser would be and wouldn't have a
5  contract with them?
6            MR. GOLUB: Well, that's a good question, your Honor.
7  But he sells through a dealer, and the economics of that is
8  that galleries usually don't disclose the name of the seller.
9  The buyer doesn't -- the buyer is very rarely interested, when
10 you buy a painting in the secondary market, who the seller is.
11 If you were to buy a painting at Sotheby's or Christie's and
12 you bid in the auction room, unless the seller of the painting
13 gives Christie's its permission, gives Christie's their
14 permission, or its permission if it's a corporation, to list
15 their name in the catalogue, the seller is virtually unknown,
16 unless the seller also wants to be listed as part of the
17 provenance. And as we say in our papers, provenance is a very
18 inexact science in the art world. Regularly, what the custom
19 and practice is with auction houses, if you were to go to
20 Christie's, your Honor, and say I want to sell a Monet I own,
21 they would say, well, do you want to listed in the provenance
22 or do you not want to be listed. It would be up to you to
23 decide that.
24           THE COURT: But this is a little bit different, isn't
25 it, since the artist is alive and she knows who she sold the
             SOUTHERN DISTRICT REPORTERS, P.C.
                      (212) 805-0300

                                                                6
   04EKROBC                    Conference
1  work to in the first instance, right?
2            MR. GOLUB: Not necessarily. The gallery -- she would
3  sell it through a gallery. And I don't know what the gallery
4  practice was, whether the gallery practice, say, in the early
5  '90s was to report back to her who the purchaser was.
6            THE COURT: Wasn't she keeping an archive?
7            MR. GOLUB: She was later. She was trying to maintain
8  a blacklist and an archive. They argue that in their papers,
9  that she keeps a detailed archive of all the owners of her
10 work. But I think that's a very difficult thing for most
11 artists to do, because if I own a painting -- if I'm Picasso
12 and I sell my painting to Mr. Jones, and Mr. Jones sells it to
13 Mr. Smith, and Mr. Smith sells it to Mr. Goldstein, it's very
14 hard to keep track of all the different sales all the way down
15 the line, unless it's always reported back to the artist.
16           THE COURT: Why isn't she part of the lawsuit?
17           MR. GOLUB: Because she's the principal. His -- the
18 contract was not made -- the contract was made with the
19 defendant, Mr. Zwirner. Craig Robins has no privity, as far as
20 I know, with Marlene Dumas.
21           THE COURT: But your client wants to be off her
22 blacklist, right?
23           MR. GOLUB: Absolutely.
                         Page 3

```
24          THE COURT:  So why isn't she a party in this lawsuit?
25          MR. GOLUB:  Well, that's economic boycotting or, as I
```

```
     04EKROBC                    Conference
 1   said before in front of Judge Koeltl, we talked about
 2   conspiracy.  Whether this is going to evolve into an antitrust
 3   case or not is something we haven't really taken on at this
 4   time.  But I do think it's a serious question.  When we filed
 5   the complaint and we filed the amended complaint, it's been a
 6   growing -- it's been a growing concept and a growing concern
 7   about whether or not this is an antitrust case or is moving in
 8   that direction.  But that wasn't our initial thought about it,
 9   because we did look into blacklisting and we were unable to
10   find anything in terms of blacklisting being illegal in the
11   State of New York.  I'm certainly open to any authority that
12   would lead me down that path.
13          THE COURT:  What's the purpose of the amended
14   complaint?
15          MR. GOLUB:  The purpose of the amended complaint was
16   to deal with the question of U.C.C. 201 and to deal with the
17   requirement that a contract -- the argument raised by the
18   defendants, that a contract for the sale of art or the sale of
19   a painting is a good and, therefore, it has to be in writing if
20   it's over $500.  And the amended complaint asserts a claim for
21   promissory estoppel and the three elements of promissory
22   estoppel.
23          THE COURT:  But how does it get around the statute of
24   frauds?
25          MR. GOLUB:  Because there's been a change of position
```

```
     04EKROBC                    Conference
 1   by the -- in reliance on the agreement, there's been a change
 2   of position by the plaintiff.  And we enumerated all the
 3   different changes of position that the plaintiff engaged in, in
 4   anticipation of the agreement being -- the agreement being
 5   carried through by the defendants or performed by the
 6   defendants.  The defendant would give the plaintiff first
 7   choice if he was able to get Ms. Dumas as a gallery artist and
 8   he be given access to the work -- and there's a third
 9   element -- and he be taken off the blacklist.
10          And dealers do -- dealers do have that kind of
11   influence with their artist.  There's a special kind of -- the
12   art world is a special kind of industry, with its own special
13   kind of rules, whether or not they're legal or illegal; a lot
14   of them have yet to be tested.
15          THE COURT:  But doesn't the agreement have to be clear
16   under a --
17          MR. GOLUB:  There has to be a clear promise, but we
18   claim there is a clear promise.
19          THE COURT:  Where is it?
20          MR. GOLUB:  We claim that the clear promise is also
21   confirmed by Mr. Zwirner's declaration where he equivocates and
22   he says, I don't remember the agreement.  And then he says --
23   as a secondary argument, he says, well, I never entered into
24   such agreement.  My client is clear that there was an
25   agreement.  And I think that's the clarity.  We're alleging the
```

04EKROBC					Conference
1	clarity of the agreement, and we also have a third-party
2	witness who, if the Court grants us our application, have a
3	hearing, we have a third-party witness --
4		THE COURT: Who is that third-party witness?
5		MR. GOLUB: An individual named Jack Tilton. He was a
6	previous dealer. And Jack didn't -- would not -- submit a
7	supporting affidavit because he also -- he has a substantial
8	amount of business with Mr. Zwirner with respect to Ms. Dumas,
9	and Mr. Tilton is a very well respected dealer in the City of
10	New York, he has a gallery called the Jack Tilton Gallery, and
11	he had to be subpoenaed. He refused to testify unless he was
12	subpoenaed. Mr. Tilton is well aware of the fact that there
13	was a possible date for a possible hearing scheduled, and he's
14	available to testify. I also happen to be Mr. Tilton's lawyer,
15	by coincidence, so that should come as no surprise later on to
16	anybody. I'm rarely in this position, where I'm also the
17	lawyer for the witness but...
18		And that, by the way, your Honor, if I could go on a
19	bit, that's the only witness to the agreement. And there are
20	only three parties.
21		THE COURT: Well, what's your proffer as to what
22	Tilton would testify about, if here?
23		MR. GOLUB: I believe Tilton's going to testify that
24	he spoke to Mr. Zwirner. And in conversations -- in more than
25	one conversation with Mr. Zwirner, Mr. Zwirner confirmed the
			SOUTHERN DISTRICT REPORTERS, P.C.
				(212) 805-0300

							10
04EKROBC					Conference
1	fact that he made this agreement with Mr. Robins, every aspect
2	of it, as well as the breach of the confidentiality agreement.
3		THE COURT: All right. Let me hear from your
4	adversary.
5		MR. GOLUB: Thank you, your Honor.
6		THE COURT: Thank you.
7		MR. HARVEY: Good morning, Judge Pauley. I think your
8	questions outline why this matter really should be decided on a
9	motion to dismiss. First, as we've cited in our papers,
10	there's the Hessel case versus Christie's, in which the
11	principle stands that a person's subjective desire to purchase
12	a particular piece of art does not rise to the level of
13	irreparable harm, so there really is no irreparable harm in
14	this case.
15		Second, with respect to the contract, as your Honor
16	has pointed out -- all of the problems with this alleged
17	agreement -- it's unspecific, it's also vague. For example,
18	the artist paints as well as draws, so she has paintings and
19	drawings. According to this agreement, we don't know which the
20	agreement was made for. Now we're being faced with a lawsuit
21	in 2010 for an alleged agreement that was made in 2005, to buy
22	art. And art is a good; it's not a service, it's a good.
23	There is no writing, there is no writing signed by Mr. Zwirner
24	or any of the defendants named in this case. And so it does
25	violate the statute of frauds. Beyond the statute of frauds,
			SOUTHERN DISTRICT REPORTERS, P.C.
				(212) 805-0300

							11
04EKROBC					Conference
1	it's also too unspecific. There's no agreement about whether
2	the alleged work to be purchased, whether it was one or more
3	than one, or an unlimited amount. There also is no agreement
4	with respect to price. There's no agreement as to whether it
					Page 5

```
 5    should be a drawing or painting.  There's no duration to the
 6    agreement.
 7              So essentially what this plaintiff is alleging is, he
 8    should be entitled to buy whatever he wants, whenever he wants,
 9    in whatever quantity he wishes, without any commitment with
10    respect to price.  And that agreement simply isn't enforceable,
11    aside from the time bar under the statute of frauds.  It's also
12    barred because of a lack of specificity.  Plus, the Court, I
13    think, put its finger right on another one of the problems.
14    Part of the relief that Mr. Robins is seeking in this case is
15    relief that we cannot possibly give him.  He says, take me off
16    the blacklist.  He doesn't allege that we put him on the
17    blacklist.  As the Court points out, the only one who could
18    have put him on such a blacklist, assuming that one exists, is
19    the artist, not Mr. Zwirner.
20              Also, this amended complaint is an acknowledgment of
21    two very important points:  One, I think it's a tacit
22    concession by the plaintiff that he knows his original claims
23    are weak and that they're insufficient as a matter of law.
24              Secondly, the plaintiff claims that he was put on this
25    blacklist and not able to buy Dumas paintings.  Yet, when you
```

04EKROBC                       Conference
```
 1    read his complaint, in paragraph 17, he acknowledges that in
 2    June 2005 and in December 2005, he bought two Dumas paintings.
 3    So it doesn't sound like he's on much of a blacklist if
 4    subsequent to this agreement with Mr. Zwirner he goes right
 5    into the market and he buys two separate pieces of work by the
 6    artist.
 7              We believe that this complaint will be dismissed if
 8    the Court has the opportunity to examine it in the context of a
 9    motion to dismiss.  What we ask that the Court do is allow us
10    to brief, very shortly, the two additional causes of action
11    that we just learned about yesterday when we read the amended
12    complaint.  We will rely upon the papers we submitted because
13    we do think they are adequate to address the remaining
14    allegations of the complaint.  If you set a briefing schedule
15    that allows us to give you a submission in short order, allows
16    the plaintiff to respond to that submission in addition to his
17    prior submissions addressing the two new causes of action,
18    promissory estoppel and equitable estoppel, we believe that the
19    Court will dismiss this complaint and, if not, narrow the
20    issues so much that if there is the need for a hearing, it will
21    take about an hour and a half because there won't be much to
22    learn, on the part of the Court, from either one of the
23    parties.
24              And so our position is, let us set -- permit us to
25    file a motion to dismiss, set a schedule, and let's argue that
```

04EKROBC                       Conference
```
 1    motion to dismiss in the context of the amended complaint,
 2    prior to any preliminary injunction hearing.  And I think what
 3    the Court will find is, none of these claims are legally
 4    sustainable.  They just don't reach the watermark in order to
 5    constitute valid causes of action under the applicable law.
 6              THE COURT:  What's going to happen to the art in the
 7    interim, if I were to do that?
 8              MR. HARVEY:  Well, this is why we're asking for it
 9    quickly, because right now our art is essentially embargoed.
```

10  These three paintings are embargoed. We represent -- Judge
11  Koeltl asked us here whether or not we would notify the Court
12  before any pending sales occurred, and we agreed that we would.
13  Judge Koeltl also asked us whether there were any current deals
14  at that time; and there weren't, and there still aren't, to our
15  knowledge. We would ask for a quick hearing on this matter
16  because you put your finger just on another problem: Our art
17  is embargoed.
18           THE COURT: But when I wanted a quick hearing, nobody
19  was available, neither the defendant nor the plaintiff.
20           MR. HARVEY: Well, we were available this week. We
21  were told by the plaintiff that his client was out of town --
22  in fact, out of the country this week -- and, in fact, before
23  Judge Koeltl, if you'll review the transcript, the plaintiff
24  told Judge Koeltl that he was ready to go that week or the
25  following week, to go immediately to a hearing. We were

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

14

04EKROBC                    Conference
1   prepared to do it. But as the plaintiff advised the Court that
2   he wasn't available this week, we had to shift it because of
3   other court obligations in other jurisdictions. So we're ready
4   to argue it in short order, and we think it should be argued in
5   short order.
6            THE COURT: Well, what's going to happen to the
7   artwork?
8            MR. HARVEY: It'll continue to be on display. And if
9   there is a buyer for one or more of the pieces that are in
10  question here, we have committed to notify the Court, and we
11  will abide by that commitment.
12           THE COURT: What's going to happen at the conclusion
13  of the show, on April 24th?
14           MR. HARVEY: I think we'll hold on to the pieces. I
15  am not aware of any contractual obligations to return them to
16  any particular location. So if there is no such obligation,
17  we'll simply hold on to them.
18           THE COURT: All right. Mr. Golub?
19           MR. GOLUB: Your Honor, we were prepared to go on --
20  we were prepared to have the preliminary injunction hearing and
21  a conversion hearing, which we applied for under 65(a)(2), that
22  week. There's been -- I'm not going to quibble about who was
23  available and when people were available. His client was out
24  of town for -- out of the country, I believe, last week. And
25  my client is out of the country this week and we tried to put

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

15

04EKROBC                    Conference
1   together a schedule. At no the time did the defendant ever say
2   to me that, you know, we're suffering any prejudice in terms of
3   scheduling any dates. And we finally agreed, in a very cordial
4   manner, on the 6th as a date. And I think we advised chambers
5   of that.
6            The Hessel case, to comment briefly on the Hessel
7   case --
8            THE COURT: I never approved that, did I?
9            MR. GOLUB: No, you did not, your Honor. It was only
10  a suggestion.
11           THE COURT: Right. I thought it was rather
12  presumptuous of both of you to send a letter to the Court
13  telling me the date that you'd agreed upon to have the hearing.
14           MR. GOLUB: I don't think any --

Page 7

```
                                            04EKROBC.txt
15              THE COURT:  I was quite surprised when it came under
16   Patterson Belknap's letterhead, quite presumptuous.
17              MR. HARVEY:  Well, we apologize, your Honor --
18              THE COURT:  Well, you should.
19              MR. HARVEY:  We apologize.
20              THE COURT:  You should.  You come in and you invoke
21   the emergency powers of the Court; now you want to file a
22   motion and have the Court decide it instantly.  But when the
23   Court wanted you to come in, nobody was available because
24   apparently this litigation is the sport of kings, among a
25   wealthy art patron and a successful gallery owner.  Excuse me
                         SOUTHERN DISTRICT REPORTERS, P.C.
                                   (212) 805-0300
```
```
                                                                          16
     04EKROBC                          Conference
 1   if I'm not impressed.
 2              MR. GOLUB:  I have to agree with you, Judge.  It is
 3   the sport of kings.
 4              THE COURT:  Well, you're going to have to get over the
 5   statute of limitations.  I don't see why I should go through
 6   the briefing on a motion to dismiss when I have a motion for a
 7   preliminary injunction before me.  I see no reason why I can't
 8   just decide that motion for a preliminary injunction.  And if
 9   you want to submit something further on the statute of frauds,
10   go ahead and do it, in light of the amended complaint.  And
11   then I'll decide the motion.  And then we'll see what's left of
12   the case.
13              MR. GOLUB:  The only -- with all due respect, your
14   Honor, the only thing short on the motion is, that on the
15   motion I would have loved to have submitted another supporting
16   affidavit, and that testimony is only available by way of
17   subpoena.  I mean Mr. Tilton has got several million dollars
18   worth of deals pending with Mr. Zwirner, and he's very
19   reluctant to testify.  That's why he had to be subpoenaed.
20              THE COURT:  Fine.  Subpoena him, OK.  And I'm starting
21   a Hobbs Act robbery/murder case on Monday that's going to go
22   for four weeks.  So we'll have a hearing at 5:00 o'clock.  Get
23   Mr. Tilton down here; I'll let you take his testimony.
24              MR. GOLUB:  5:00 o'clock today?
25              THE COURT:  No, not 5:00 o'clock today.
                         SOUTHERN DISTRICT REPORTERS, P.C.
                                   (212) 805-0300
```

```
                                                                          17
     04EKROBC                          Conference
 1   5:00 o'clock -- subpoena him for April 27th.  We'll have a
 2   hearing.
 3              MR. GOLUB:  Just Mr. Tilton?
 4              THE COURT:  That's all you need to complete your
 5   motion, right?
 6              MR. GOLUB:  Absolutely, your Honor.
 7              THE COURT:  Fine.  And defendants will be here for
 8   cross-examination.
 9              MR. HARVEY:  Yes, your Honor.
10              MR. GOLUB:  April 27th at 5:00 o'clock.
11              THE COURT:  April -- we'll have an evidentiary hearing
12   on April 27 at 5:00 o'clock, to tie off the preliminary
13   injunction issue.  And I'd like to have some briefing as to
14   why, in light of the amended -- why the amended complaint and
15   your promissory estoppel theory gets you around the statute of
16   frauds.  And I'd like you to address both Sections 206 and 201.
17              MR. GOLUB:  Yes, your Honor.
18              THE COURT:  How long do you think it will take to
19   present your direct testimony of Mr. Tilton?
                                     Page 8
```

```
                              04EKROBC.txt
20            MR. GOLUB:  I would say less than 45 minutes, less
21   than -- maybe even less than a half hour.  Mr. Tilton is a man
22   of few words.
23            THE COURT:  All right, it's generally not the
24   witnesses I worry about; it's the lawyers with their questions.
25            MR. GOLUB:  Well, I'll try to be brief.
                       SOUTHERN DISTRICT REPORTERS, P.C.
                                (212) 805-0300
```
```
     04EKROBC                    Conference
 1            THE COURT:  All right.
 2            MR. HARVEY:  Judge, do you wish any responsive
 3   briefing to the submission by plaintiff on the amended
 4   complaint issues?
 5            THE COURT:  Yeah, well, I thought you had earlier said
 6   you'd like to tee something up.
 7            MR. HARVEY:  That's correct.
 8            THE COURT:  So, fine, why don't you get it to me on
 9   Tuesday so that I can look at it before we have our evidentiary
10   hearing.
11            MR. GOLUB:  Your Honor, one more thing:  We do deal
12   with the -- in our reply brief we do deal with the issue of
13   promissory estoppel at some length.  We'd also like the
14   opportunity to supplement that if we --
15            THE COURT:  I'm inviting it --
16            MR. GOLUB:  OK.
17            THE COURT:  -- in light of the amended complaint.
18            MR. GOLUB:  When we filed the amended complaint, our
19   reply papers were sort of in lockstep with that, but we're
20   going to add to that.
21            THE COURT:  Add to it.  Get me a memorandum by
22   12:00 noon on Tuesday.  All right?
23            MR. GOLUB:  Absolutely, your Honor.
24            THE COURT:  All right.  So you're authorized to
25   subpoena him, make it returnable here at 5:00 o'clock on
                       SOUTHERN DISTRICT REPORTERS, P.C.
                                (212) 805-0300
```
```
     04EKROBC                    Conference
 1   April 27.
 2            MR. GOLUB:  Thank you, your Honor.
 3            THE COURT:  Anything further, Mr. Harvey?
 4            MR. HARVEY:  No, sir.  I think that's fine, Judge.
 5   Thank you.
 6            THE COURT:  Very well.  I'll see you next week.
 7            MR. GOLUB:  Thank you, your Honor.
 8            Your Honor --
 9            THE COURT:  Hold it.  I've got my dates mixed up.
10            MR. GOLUB:  Right.  It's the following --
11            MR. HARVEY:  We were going to bring that to your
12   attention.
13            THE COURT:  I'm talking about Tuesday, April 20th.  Is
14   that date going to work for both of you?
15            MR. GOLUB:  Mr. Tilton has Parkinson's disease, and I
16   know that he was going off to Scotland to see a special doctor.
17   And he -- I think he may be in Scotland on Tuesday.  I know on
18   the 26th he was available and I'm sure he's available on the
19   27th.  Could I make a short phone call and try to reach him?
20            THE COURT:  Why don't you do that.
21            MR. GOLUB:  OK.
22            THE COURT:  And come on back and tell me.  So don't go
23   away but step out of the well so I can move on to something
24   else.
```

```
25          (Pause)
                SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300
                                                                    20
     04EKROBC               Conference
 1          MR. GOLUB:  Everything is fine, your Honor, for
 2   5:00 o'clock on the 20th.  It's all set.
 3          THE COURT:  So we'll proceed at 5:00 o'clock on
 4   April 20th with Mr. Tilton?
 5          MR. GOLUB:  Yes, your Honor.
 6          THE COURT:  All right.  And you can get your briefing
 7   in to me by 12:00 noon on the statute of frauds issue.
 8          MR. GOLUB:  Yes, your Honor.
 9          THE COURT:  All right.
10          MR. HARVEY:  Judge, do you still wish us to submit our
11   supplemental brief on Tuesday as well?
12          THE COURT:  Yeah, I don't see -- we might as well tee
13   it up so it's all in front of me.  All right?
14          MR. GOLUB:  Thank you, Judge.
15          THE COURT:  Thank you very much.
16          MR. HARVEY:  One last point, Judge:  Judge, if we have
17   any additional declarations that we think will be helpful to
18   the Court, may we submit them as well with our supplemental
19   briefs?
20          THE COURT:  Yes, yes.
21          MR. HARVEY:  We don't know that we will --
22          THE COURT:  Right, and if you do, since this is the
23   plaintiff's motion, I tell you that if it opens the door to
24   something further from the plaintiff, I'm going to permit it.
25          MR. HARVEY:  Very well.
                SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300
                                                                    21
     04EKROBC               Conference
 1          THE COURT:  All right.
 2          MR. HARVEY:  Thank you.
 3          THE COURT:  Thank you.  I'll see you on Tuesday at
 4   5:00 o'clock.
 5          MR. GOLUB:  Thank you, Judge.
 6          MR. HARVEY:  Thank you, Judge.
                              * * *
```