UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------X
CRAIG ROBINS,                 :

        Plaintiff,         :    10 Civ. 2787 (WHP)

    -against-                :    MEMORANDUM & ORDER

DAVID ZWIRNER, et al.,        :

        Defendants.        :
------------------------------X

WILLIAM H. PAULEY III, District Judge:

> USDC SDNY
> DOCUMENT
> ELECTRONICALLY FILED
> DOC #: _____
> DATE FILED: 5/20/2010

    Plaintiff Craig Robins ("Robins") brings this breach of contract action against Defendants David Zwirner ("Zwirner"), David Zwirner Gallery, and David Zwirner, Inc. (collectively the "Gallery") claiming that Zwirner reneged on a promise to sell certain paintings by the artist Marlene Dumas ("Dumas") to Robins. Robins seeks, <u>inter alia</u>, specific performance of the oral agreements. He moves for a preliminary injunction under Fed. R. Civ. P. 65 to prevent the Defendants from selling, pledging, or otherwise disposing of three Dumas paintings while this litigation is pending. For the following reasons, Plaintiff's application for a preliminary injunction is denied.

## BACKGROUND

    This lawsuit offers an unflattering portrait of the art world—a realm of self-proclaimed royalty full of "blacklists," "greylists," and astonishing chicanery. Robins is an art patron from Miami Beach, Florida who has amassed a substantial collection of Dumas' works. (Affidavit of Craig Robins in Support of Preliminary Injunction dated Mar. 29, 2010 ("Robins

Aff.") ¶ 2.) Zwirner is an art dealer and the owner of the Gallery bearing his name in the Chelsea section of Manhattan. (Declaration of David Zwirner ("Zwirner Decl.") ¶ 1.) The Gallery displays and sells works of art and represents contemporary artists. (Zwirner Decl. ¶ 2.) Dumas is a South African artist who Zwirner has represented since April 2008. (Zwirner Decl. ¶¶ 2, 3, 17.) Before that time, another New York gallerist Jack Tilton ("Tilton") represented Dumas for almost two decades and displayed her works at a gallery bearing his name on the Upper East Side of Manhattan. (Transcript of Apr. 21, 2010 Hearing ("Tr.") at 3-4.)

### A. The Confidentiality Agreement

In late 2004, Robins approached Tilton for assistance in selling a Dumas painting titled Reinhardt's Daughter. (Robins Aff. ¶ 3; Tr. at 6-7.) Robins had purchased Reinhardt's Daughter in the Secondary Market.[1] (Robins Aff. ¶ 3.) Tilton contacted Zwirner, with whom he had done business before, to ascertain whether Zwirner could sell the painting on consignment. (Tr. at 7-8.) Thereafter, Zwirner informed Tilton that he had located a buyer. (Zwirner Decl. ¶ 5; Zwirner Decl. Ex. A: Invoice dated Nov. 15, 2004.) Tilton told Zwirner repeatedly that Robins wanted the transaction to be kept secret. (Tr. at 8.) During a telephone conversation with Tilton, Zwirner agreed to keep the sale confidential (the "Confidentiality Agreement"). (First Amended Complaint dated Apr. 12, 2010 ("Am. Compl.") ¶ 8; Tr. at 7-10.) According to Robins, the Confidentiality Agreement was intended to prevent Dumas, who opposed Secondary Market sales of her works, from learning of the deal. (Robins Aff. ¶¶ 3-4.) Dumas did not sell to

---

[1] The Amended Complaint refers to both the "Primary" and "Secondary" Markets for artwork. The Primary Market includes the sale of artwork by living artists for the first time, often at gallery exhibits. (Tr. at 4.) The Secondary Market includes works being resold at galleries or in private sales and often involves the works of deceased artists. (Robins Aff. ¶¶ 2-4; Tr. at 4.)

collectors who "churned" her work in the Secondary Market. (Tr. at 9.) Contrary to Robins' and Tilton's statements, Zwirner avers that he "did not enter into any confidentiality agreement, written or oral, with Mr. Robins" and that, although an art sale is usually kept confidential during negotiations, after a piece is sold, "the new ownership of the work is as public or as private as the new owner wishes to make it." (Zwirner Decl. ¶ 8.)

On December 2, 2004, Robins and Zwirner signed a document titled "Robins Exchange No. 1004," which memorialized the sale of Reinhardt's Daughter from Robins to Zwirner in a section called "Relinquished Property Contract ('Sales Agreement')." (Zwirner Decl. Ex. B: Robins Exchange No. 1004 dated Dec. 2, 2004 ("Sales Agreement").) No confidentiality provision was included in the Sales Agreement.

B. The Dumas Blacklist

In early 2005, while Zwirner was collaborating with Dumas on a catalogue, he informed the artist that Robins had sold Reinhardt's Daughter. (Robins Aff. ¶ 6.) On March 5, 2005, Dumas' studio manager in the Netherlands, Jolie van Leeuwen ("van Leeuwen"), emailed Tilton inquiring if Robins had sold Reinhardt's Daughter. (Defendants' Ex. A: Email from Dumas to Tilton dated Mar. 5, 2005.) Tilton confirmed that Robins had sold the painting for personal reasons. (Defendants' Ex. B: Email from Dumas to Tilton dated Mar. 25, 2005.) Tilton testified that when van Leeuwen learned of Robins' sale of Reinhardt's Daughter, she was "quite upset" and "hysterical[]." (Tr. at 17.) Upon learning Robins had sold Reinhardt's Daughter, Dumas also "became so incensed that she literally blacklisted [Robins] from purchasing any other work of hers in the Primary Market." (Robins Aff. ¶ 6.)

3

Tilton acknowledged that Dumas "blacklisted" persons suspected of selling her work in the Secondary Market. (Tr. at 16-17.) In early 2005, van Leeuwen circulated to gallerists several lists of collectors forbidden from purchasing Dumas' art (collectively the "Dumas Blacklist"). Names were added to the lists by recipients who contacted Dumas to inform her of sales in the Secondary Market. (Tr. at 21-28.) A March 2005 version of the Dumas Blacklist includes Robins' name under the heading "Grey List." According to Tilton, the Dumas Blacklist was actually two lists—a Blacklist and the Grey List. The two lists were functionally equivalent—persons on either roll were theoretically forbidden by Dumas from purchasing her works. (Tr. at 21.) The March 2005 version of the Dumas Blacklist contains the following passage:

> From all of you [gallerists] I have received names of persons that we consider for a blacklist. Also with the reasons why these people are considered for a black list. We also spoke about the difficulties of making such a list and about personal grieve [sic] about grey lists of names that are not to be called crooks but you will not so quickly sell them another work from Dumas anymore. Most of these grey names are from people that want a new piece or people that sell thru other galleries or sell themselves, but still consider themselves as admirers of DUMAS. But please let [sic] not sell to the grey list persons either, for the time being.

(Defendants' Ex. D: Dumas Blacklist and Grey List dated Mar. 2005 ("Dumas Blacklist") at 1.)

Many of the names on the Dumas Blacklist are accompanied by the informant who disclosed the identity of a seller in the Secondary Market. Robins' name appears on the Grey List, but no informant is listed. (Dumas Blacklist at 1.) Zwirner's name is also on the March 2005 Dumas Blacklist with a notation that Jack Tilton, his competitor, reported him. (Dumas Blacklist at 1.) Tilton admitted he added Zwirner because Zwirner "was actively selling

numerous pieces by Marlene, buying and selling in the secondary market." (Tr. at 55.)

There were only two ways a person could be removed from the Dumas Blacklist. First, Dumas herself could cross someone off the list. (Tr. at 64.) Alternatively, if a gallerist was on the list, his name could be removed if he became Dumas' representative and was given "access to her work." (Tr. at 66.)

C. The Gallery Agreement

In early 2005, Zwirner told Robins that his name was on the Dumas Blacklist. (Tr. at 18.) Robins was "livid" when he learned that Zwirner had revealed his sale of Reinhardt's Daughter to Dumas. (Tr. at 19.) After telling Tilton that he wished to sue Zwirner, Tilton encouraged Robins to meet with Zwirner to stave off litigation. (Tr. at 19.)

In late March 2005, Robins, Zwirner, and Tilton met at the Gallery. (Robins Aff. ¶ 8.) According to Robins, as consideration for refraining from legal action, Zwirner agreed to give Robins "first choice, after museums, to purchase one or more" of Dumas' works whenever Dumas had an exhibition at the Gallery and to remove Robins name from the Dumas Blacklist (the "Gallery Agreement"). (Robins Aff. ¶ 8.) The Gallery Agreement was oral and concluded with a handshake. (Robins Aff. ¶ 8.) Tilton remembers that Robins was given "first choice on something that [Zwirner] would show in his gallery going forward," which could include one or one or more paintings because "sometimes Marlene works in groups." (Tr. at 20.) Not surprisingly, Zwirner recalls the meeting differently. In his version, Tilton was not present and the meeting occurred in May 2005. At that time, Zwirner agreed "in principle" to sell Robins "other unspecified works from upcoming exhibitions of artists that [Zwirner] represented at the time, whose work was in high demand and for whom there were waiting lists." (Zwirner Decl. ¶

5

15.) Robins and Zwirner both agree that there is no writing memorializing the meeting or the Gallery Agreement. (Tr. at 46.)

### D. Dumas' Show at the Zwirner Gallery

In March 2010, Zwirner opened a Dumas exhibition titled "Against the Wall" (the "Exhibition") at the Gallery. (Robins Aff. ¶ 10.) The Exhibition ran from March 18 to April 24, 2010. (Robins Aff. ¶ 10.) On March 4, 2010, Robins emailed Zwirner regarding his intention to purchase Dumas works from the Exhibition:

> Hi David. As you will recall, we resolved our disagreement a few years ago with your commitment to give me first choice on the Dumas show after museums. I look forward to seeing the images of works in the show as well as the pricing. If you do not mind, I would like to share the images with Jack to get his input. Thank you in advance. I hope you are well. Craig

(Robins Aff. Ex. 1: Email from Robins to Zwirner dated Mar. 4, 2010.) After receiving no response from Zwirner, Robins followed up with another email on March 13:

> Hi David: I am concerned because you did not acknowledge your obligation under our settlement agreement. Hopefully, this is not an issue and we are on the same page. Please do not think that you can absolve yourself of your responsibility by ignoring me. I enjoy our relationship and would not want to be in a conflict with you. Craig

(Robins Aff. Ex. 2: Email from Robins to Zwirner dated Mar. 13, 2010.) That provoked a response. Two days later, Zwirner acknowledged his receipt of both emails and addressed an issue concerning Robins and Zwirner's partnership in another painting. (Robins Aff. Ex. 3: Email from Zwirner to Robins dated Mar. 4, 2010.)

After another email from Robins to Zwirner on March 16, 2010, Zwirner responded:

> Dear Craig, I do recall our disagreement that we had in 2004 about Marlene Dumas. But I do not remember promising to give you priority in the purchase of a work by Dumas, and cannot find any record of any promise like that. In fact, I could not have made that promise, as Marlene did not join my gallery until three years later.

(Robins Aff. Ex. 5: Email from Zwirner to Robins dated Mar. 17, 2010.) At this point, Robins advised Zwirner that he intended to purchase three Exhibition paintings by Dumas: Figure in a Landscape, Under Construction, and Wall Weeping (the "Three Dumas Paintings"). (Robins Aff. ¶ 11.) Zwirner refused to sell these paintings to Robins. (Robins Aff. ¶ 13.) Instead, he offered Robins a Dumas painting titled The Grapes of Plenty, which Robins claims was nothing more than a "glaring sarcastic insult." (Robins Aff. ¶ 13.)

On March 29, 2010, Robins commenced this action and sought a temporary restraining order. (Robins Aff. ¶ 16.) Robins seeks specific performance of the Gallery Agreement because Dumas' works are "nearly impossible to obtain as Dumas creates a limited amount." (Robins Aff. ¶ 17.) Robins also claims the Exhibition is "a unique body of Israeli themed works," and Dumas "may never do similar paintings." (Robins Aff. ¶ 17.) Absent an injunction allowing him to purchase the art, Robins claims he "will not have first provenance in any of the subject paintings" which would "materially" impair his collection. (Robins Aff. ¶ 19.) In his Amended Complaint, Robins alleges that in, reliance on Zwirner fulfilling the Gallery Agreement, he purchased several Dumas works—a set of seven drawings in June 2005 and a $500,000 oil painting in December 2005. (Am. Compl. ¶ 17.) On April 21, 2010, this Court conducted an evidentiary hearing.

7

## DISCUSSION

A court may grant a preliminary injunction "if the moving party establishes (1) irreparable harm and (2) either (a) a likelihood of success on the merits, or (b) sufficiently serious questions going to the merits of its claims to make them fair ground for litigation, plus a balance of the hardships tipping decidedly in favor of the moving party." Lynch v. City of N.Y., 589 F.3d 94, 98 (2d Cir. 2009). An injunction should be granted only "when the intervention of a court of equity is essential to protect a party's property rights against injuries that would otherwise be irremediable." Ticor Title Ins. Co. v. Cohen, 173 F.3d 63, 68 (2d Cir. 1999) (citing Cavanaugh v. Looney, 248 U.S. 453, 456 (1919)).

A. <u>Irreparable Harm</u>

Irreparable harm is the "single most important prerequisite for the issuance of a preliminary injunction." Bell & Howell Mamiya Co. v. Masel Supply Co. Corp., 719 F.2d 42, 45 (2d Cir. 1983). The mere possibility of harm is not sufficient; rather, the harm must be real and imminent, and the movant must show that it is likely to suffer the harm if equitable relief is denied. See Register.com, Inc. v. Verio, Inc., 356 F.3d 393, 427 (2d Cir. 2004). Irreparable harm is "injury for which a monetary award cannot be adequate compensation," Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc., 596 F.2d 70, 72 (2d Cir. 1979), and is often found in the loss of a unique product or service. See Tom Doherty Assocs., Inc v. Saban Entm't, Inc., 60 F.3d 27, 37-38 (2d Cir. 1995); Reuters Ltd. v. United Press Int'l, Inc., 903 F.2d 904, 907-08 (2d Cir. 1990). In this regard, a showing of irreparable harm is similar to the showing required for specific performance of a contract. Cf. David Turnick, Inc. v. Kornfeld, 838 F. Supp. 848, 852 (S.D.N.Y.

1993) (finding two photo prints, even where produced by the same artist and same plate, to be unique).

Original works of art are within the small category of intrinsically unique goods for which a specific performance remedy is appropriate. See N.Y. U.C.C. § 2-716 & cmt. 2 ("Output and requirements contracts involving a particular or peculiarly available source or market present today the typical commercial specific performance situation, as contrasted with contracts for the sale of heirlooms or priceless works of art which were usually involved in the older cases." (emphasis added)); Kornfeld, 838 F. Supp. at 852 ("Thus, each print is, by definition, unique. Hence, there can be no exact substitute for a given print purchased by a collector."). This is because a painting's value depends, in large part, on "the purchaser's aesthetic sensibilities" and the "eye of the beholder"—accordingly, affixing an appropriate monetary remedy for these goods is difficult. See Kornfeld, 838 F. Supp. at 852. That art sales are not covered by the standards applicable to most sale-of-goods contracts is demonstrated by New York's enactment of special rules governing fine art transactions. See N.Y. Arts & Cult. Aff. L. § 1.01 et seq.; see also Levin v. Dalva Bros., Inc., 459 F.3d 68, 77 (1st Cir. 2006) (considering breach of warranty claims under N.Y. Arts & Cult. Aff. L. § 13.01). Notably, lay purchasers of fine art are afforded stronger warranty protection than that available under Article 2 of the Uniform Commercial Code (the "U.C.C."). See N.Y. Cult. Aff. L. § 13.01; Levin, 459 F.3d at 75 ("The fine art statute provides that whenever an art merchant sells a work of fine art to someone who is not an art merchant and provides a document certifying the period or author of the piece, the merchant's representation is an express warranty.").

The Three Dumas Paintings are unique works of art. Thus, if a breach of contract has occurred, a damages remedy would be inadequate to make Robins whole. Dumas rarely makes her work available in the Primary Market. Moreover, the Exhibition paintings relate to the Israeli-Palestinian conflict. For Dumas, scenes of the Wailing Wall in Jerusalem are thematically exceptional and in a subject area she is unlikely to soon revisit. If one of these paintings is sold, Robins will have no recourse to obtain a substitute. See Kornfeld, 838 F. Supp. at 852 ("In this context it would be fundamentally unfair, and unsound policy, to impose on plaintiff a duty to accept another—inherently different—[work of art] as a substitute for the one plaintiff actually viewed, bid for, and purchased."). Accordingly, Robins has shown irreparable harm.

B. Likelihood of Success on the Merits

Robins' application for injunctive relief rests primarily on Zwirner's alleged breach of the Confidentiality and Gallery Agreements. Defendants contend that the Statute of Frauds bars enforcement of these two oral agreements.

1. Statute of Frauds

Under New York law, "a contract for the sale of goods for the price of $500 or more is not enforceable" without a contemporaneous writing "sufficient to indicate that a contract for sale has been made between the parties and signed by the party against whom enforcement is sought." N.Y. U.C.C. § 2-201(1); Hoffman v. Boone, 708 F. Supp. 78, 80 (S.D.N.Y. 1989) (applying § 2-201 to sale of art). However, where a service component of a contract "predominates" over the incidental sale of personal property, an oral agreement is barred by the Statute of Frauds only if it is incapable of being performed within one year. See N.Y.

Gen. Oblig. L. § 5-701; Esquire Radio & Elecs., Inc. v. Montgomery Ward & Co., Inc., 804 F.2d 787, 794-95 (2d Cir. 1986) (citation omitted); Computech Int'l, Inc. v. Compaq Computer Corp., No. 02 Civ. 2628 (RWS), 2002 WL 31398933, at *3 (S.D.N.Y. Oct. 24, 2002) (applying New York law to a service contract). Where an "oral agreement between the parties call[s] for performance of an indefinite duration and [can] only be terminated within one year by its breach during that period," it is void under the Statute of Frauds. D & N Boening, Inc. v. Kirsch Beverages, Inc., 472 N.E.2d 992, 995 (N.Y. 1984). New York courts look to "the main objective sought to be accomplished by the contracting parties" to determine whether a contract is for the sale of goods or rendition of services. Consol. Edison Co. of N.Y., Inc. v. Westinghouse Elec. Corp., 567 F. Supp. 358, 361 (S.D.N.Y. 1983); see also Harte v. Iberia, Lineas Aereas de Espana, S.A., No. 02 Civ. 362 (LMM), 2004 WL 1375119, at *1 (S.D.N.Y. June 17, 2004).

    a. The Confidentiality Agreement

The Confidentiality Agreement between Tilton, as agent for Robins, and Zwirner was a verbal accord for a service to be performed by Zwirner—non-disclosure of Robins' sale—and, according to Tilton, was intended to last for "an unlimited duration." Since the agreement was premised on Dumas never learning that Robins had sold Reinhardt's Daughter, the Confidentiality Agreement could not be fully performed within one year. See D&N Boening, 472 N.E. 2d at 993. Indeed, the only way the Confidentiality Agreement could terminate within one year was if Zwirner breached the agreement. Enforcement of this contract is barred by the Statute of Frauds. See Koret, Inc. v. RJR Nabisco, Inc., 702 F. Supp. 412, 414-15 (S.D.N.Y. 1988) ("An oral contract that is 'terminable within one year only upon a breach by one of the parties' is not enforceable under New York law." (citations omitted)).

11

### b. The Gallery Agreement

Under the Gallery Agreement, Robins was to (1) receive first choice, after museums, to purchase one or more Dumas works, (2) be removed from the Dumas Blacklist, and (3) receive access to Dumas' works in the Primary Market. Despite Plaintiff's averments, the primary objective of this agreement was the future sale to Robins of at least one Dumas painting. Plaintiff's assertion that this is a service agreement is undercut by the fact that only Dumas, a non-party to this litigation, can remove Robins from the Blacklist. The only aspect of the Gallery Agreement that Zwirner can control is the sale of the Three Dumas Paintings from the Gallery.

The Gallery Agreement granted Robins a right of first refusal—in essence, an agreement to agree on a future painting. A right of first refusal "requires [an] owner, when and if he decides to sell, to offer the property first to the party holding the preemptive right so that he may meet a third-party offer or buy the property at some other price set by a previously stipulated method." Metro. Transp. Auth. v. Bruken Realty Corp., 492 N.E.2d 379, 382 (N.Y. 1986); McCormick v. Bechtol, 891 N.Y.S.2d 188, 191 (3d Dep't 2009). Rights of first refusal and agreements to agree on the sale of a good are both governed by the U.C.C., and it is "well settled that an oral agreement to execute an agreement that is within the [S]tatute of [F]rauds is itself within the statute." Backus Plywood Corp. v. Commercial Decal, Inc., 317 F.2d 339, 343 (2d Cir. 1963) (collecting cases); see Boone, 708 F. Supp. at 80-81; see also Stillman v. Townsend, No. 05 Civ. 6612 (WHP), 2006 WL 2067035, at *2-3 (S.D.N.Y. July 26, 2006) ("[E]ven if the Agreement constitutes an oral 'agreement to agree,' it remains subject to the statute of frauds."). The relevant Statute of Frauds provisions are set forth in U.C.C. sections 2-201, the sale of goods provision, and 1-206, the sale of personal property provision. See Sel-Leb Mktg., Inc. v. Dial

Corp., No. 01 Civ. 9250 (SHS), 2002 WL 1974056, at *6 (S.D.N.Y. Aug. 27, 2002); 25 Williston on Contracts § 67:85 (4th ed.).

Under either of sections 1-206 or 2-201, enforcement of the Gallery Agreement is barred by the Statute of Frauds. The Three Dumas Paintings are each priced over $1 million, and Plaintiff has not come forward with any writing signed by Zwirner promising to sell paintings to Robins. Absent a writing signed by Zwirner, enforcement of the oral Gallery Agreement is barred.

2. Promissory Estoppel

As an alternative ground for recovery, Robins submits that Zwirner should be estopped from reneging on his promise to sell the Three Dumas Paintings. To recover under promissory estoppel, a plaintiff must show (1) a clear and unambiguous promise, (2) reasonable and foreseeable reliance by the party to whom the promise was made, and (3) an injury to the party to whom the promise was made by reason of the reliance. Cyberchron Corp. v. Calldata Sys. Dev., Inc., 47 F.3d 39, 44 (2d Cir. 1995); Townsend, 2006 WL 2067035, at *4. When promissory estoppel is interjected to overcome a valid Statute of Frauds defense, it "has been strictly construed to apply only in those rare cases where 'the circumstances [are] such as to render it unconscionable to deny the oral promise upon which the promisee has relied.'" Townsend, 2006 WL 2067035, at *4 (emphasis added); see also Cyberchron, 47 F.3d at 44; Philo Smith & Co. v. USLife Corp., 554 F.2d 34, 36 (2d Cir. 1977).

Because Robins alleges no injuries sufficiently severe to be "unconscionable," he is unlikely to succeed on estoppel grounds. The Court of Appeals has defined an "unconscionable injury" as "beyond that which flows naturally (expectation damages) from the

13

non-performance of the unenforceable agreement." Merex A.G. v. Fairchild Weston Sys., Inc., 29 F.3d 821, 827 (2d Cir. 1994). Here, any injuries Robins suffers are within the realm one would reasonably expect from the non-performance of a sales contract—Robins does not own the artworks promised to him. Moreover, when Robins sold Reinhardt's Daughter, he was aware Dumas might learn of the transaction and ban him from purchasing in the Primary Market. Indeed, it was for that reason that he sought the Confidentiality Agreement. "To invoke the power that equity possesses to trump the Statute of Frauds," Merex, 29 F.3d at 826, a plaintiff must suffer a greater injury than one that is both predictable and, to a certain degree, the consequences of the Plaintiff's own choices.

The standard of "unconscionability" cannot be judged solely based on Plaintiff's personal tastes. Because Robins has not shown an unexpected and serious injury flowing from the breach of Zwirner's promises, has been able to purchase Dumas art, and has been offered another painting from the Exhibition by Zwirner, he is unlikely to show an unconscionable injury. Accordingly, a preliminary injunction on estoppel grounds is not warranted.

### 3. Fraudulent Inducement Claims

Plaintiff's remaining claims sound in fraud but merely duplicate his breach of contract and estoppel claims. "It is well settled under New York law that a party cannot maintain overlapping fraud and breach of contract claims." Townsend, 2006 WL 2067035, at *6; accord Bridgestone/Firestone, Inc. v. Recovery Credit Serv., Inc., 98 F.3d 13, 19-20 (2d Cir. 1996) ("[T]hese facts amount to little more than intentionally-false statements by Beladino indicating his intent to perform under the contract."); New York Univ. v. Cont'l Ins. Co., 662 N.E.2d 763, 768-70 (N.Y. 1995). To state a fraud claim "co-existent with an alleged breach of contract, [a

plaintiff] must '(i) demonstrate a legal duty separate from the duty to perform under the contract; (ii) demonstrate a fraudulent misrepresentation collateral or extraneous to the contract; or (iii) seek special damages that are caused by the misrepresentation and unrecoverable as contract damages.'" Townsend, 2006 WL 2067035, at *6 (quoting Bridgestone, 98 F.3d at 20).

While Robins alleges "wanton dishonesty" on Zwirner's part, his fraud claims amount to nothing more than a reiteration of his contract claims with words like "purposefully" and "induced" sprinkled in. Robins does not allege any special duty owed by Zwirner, and, for the reasons discussed above, he suffered no special damages from Zwirner's misdeeds. Further, given that Zwirner did not even represent Dumas in 2005, and was himself on the Dumas Blacklist, it is difficult to conceive how Zwirner intended to violate his agreements with Robins. Accordingly, Plaintiff's fraudulent inducement claims are unlikely to succeed on the merits.

## CONCLUSION

As the facts of this case make clear, some in the art world desire a market that is neither open nor honest. Thus, collectors in this seemingly refined bazaar should heed the admonition "caveat emptor" and be mindful of the Statue of Frauds.

For the foregoing reasons, Plaintiff Craig Robins' application for a preliminary injunction is denied.

Dated: May 20, 2010
      New York, New York

SO ORDERED:

_____
WILLIAM H. PAULEY III
U.S.D.J.

*Counsel of Record*:

Aaron Richard Golub, Esq.
42 East 64th Street
New York, NY 10021
*Counsel for Plaintiff*

Peter C. Harvey, Esq.
Patterson Belknap Webb & Tyler LLP
1133 Avenue of the Americas
New York, NY 10036
*Counsel for Defendants*